(No. 28001.—
FRANK G. STAUFENBIEL, Appellee, *vs.* ALBERT C. STAUFENBIEL, Appellant.

*Opinion filed Nov. 22, 1944—Rehearing denied Jan. 15, 1945.*

512

MARKMAN, DONOVAN & SULLIVAN, and GEORGE F. SCHECK, (THOMAS C. DONOVAN, of counsel,) all of Chicago, for appellant.

SEYMOUR N. COHEN, and PAUL P. PRESTON, both of Chicago, for appellee.

Mr. JUSTICE THOMPSON delivered the opinion of the court:

By this appeal, defendant-appellant, Albert C. Staufenbiel, seeks to reverse a decree of the superior court of Cook county directing him to convey to his brother, plaintiff-appellee, Frank G. Staufenbiel, a one-half interest in certain property, commonly known as "Eagle Point Resort," located in Lake county, Illinois; and further directing that the cause be referred to a master in chancery for an accounting as between the parties.

Frank G. Staufenbiel, hereinafter referred to as plaintiff, filed his complaint in the superior court of Cook county, alleging that he had furnished substantial sums of money for the purchase of certain properties, the title being taken thereto in his name and in the name of his brother, Albert C. Staufenbiel, hereinafter referred to as defendant, as joint tenants; that the defendant contributed nothing to the purchase of said properties and that on October 24, 1932, defendant fraudulently induced plaintiff to enter into a certain contract under which said defendant was to manage the properties and account to plaintiff for the proceeds thereof; that thereafter, through fraud, title to one property was put in the name of Alice Kiely, also made a defendant herein, and title to the other parcel was put in the name of defendant-appellant. The complaint prayed: (a) that the deeds conveying said properties to said defendant and Alice Kiely be declared null and void and that they be directed to reconvey to the plaintiff; (b) that the contract of October 24, 1932, be declared null and

void; (c) that an injunction issue; (d) that the court find title to the properties in the plaintiff; (e) that the defendants, Albert C. Staufenbiel and Alice Kiely, account for moneys received from the properties or taken from the plaintiff, etc.

The defendant answered denying that he had purchased the properties with the plaintiff's money and alleging said properties were purchased by said defendant with his own funds. Defendant further denied that the contract of October 24, 1932, was induced by fraud. Said answer further alleged that the deed to the Lake county property was executed for good and valuable consideration and was not procured by fraud, and, further, that the deed in favor of Alice Kiely was executed for the purpose of conveying title to prevent plaintiff's wife from asserting any claim to the property. In addition to this answer, which denied all the material allegations of the complaint, the defendant filed a second supplemental answer and counterclaim in which defendant alleged a certain contract dated May 10, 1934, was entered into, and prayed for specific performance of said contract. To this an answer was filed by plaintiff admitting the existence of the contract but denying that the consideration thereof was paid or that there was any delivery of the contract. The cause was referred to a master in chancery who reported his findings and a decree was entered by the superior court on December 30, 1943, confirming and adopting the report in each and every particular and overruling the exceptions filed thereto. Some of the issues were decided adversely to the plaintiff but, no cross appeal being filed, these issues are disposed of.

The question presented in the pleadings as to the deed to Alice Kiely, which conveyed certain property located at 6208 North Artesian avenue, is not now before the court for the reason same was sold by agreement during the pendency of this case. The controlling question presented, and from which part of the decree defendant appealed to

this court, and which is presented in his assignment of errors, pertains to the property known as "Eagle Point Resort." It was found by the decree of the trial court that the deed dated May 10, 1934, and recorded July 25, 1938, from the plaintiff to defendant, conveying plaintiff's one-half interest in said resort property to defendant, was void and ordered that it be set aside and cancelled. It was also held that said agreement entered into on the same date was never delivered or fulfilled, nor was there any intention on the part of either of the parties to carry out the terms of said agreement; that the same was abrogated by mutual consent and that same should be rescinded and be of no force and effect; that a certain release pertaining thereto was never delivered but was procured by defendant in an unknown manner and that the $500 consideration recited in the agreement of May 10, 1934, and in the release, was never paid; that the deed of May 10, 1934, should be set aside and declared null and void as against the plaintiff and his heirs and assigns as a cloud upon his title. In addition, the chancellor re-referred the cause to the master to state an account between the parties. From this ruling defendant appeals to this court.

For a better understanding of the contentions presented here by the parties we feel that a brief statement of the facts surrounding this controversy is necessary. During the year 1919, Frank G. Staufenbiel, and his brother, Albert C. Staufenbiel, resided at the home of their mother, Anna Staufenbiel, in the city of Chicago. Both started work in 1912. Albert worked for railroad companies and engaged in the real estate business. Frank started to work for an insurance company, later moving to Ohio, where in 1919, he became State agent. From the inception of his employment his earnings were substantial and he made from $3000 to $5000 a year in addition to all expenses. From this employment he began to send home checks to his mother, and from 1919 to 1933, he forwarded a total

sum of $21,731. The greater part of these checks was endorsed by Albert and the proceeds were deposited in their joint bank account or kept in various safety-deposit boxes. During the year 1921, Frank and Albert purchased, by warranty deed, a two-flat building, located at 4950 North Monticello avenue, Chicago, Illinois, the consideration for the property being $11,500. For this amount the parties assumed a mortgage for $4000, made a junior mortgage for $3750 and the balance, amounting to $3750, was paid in cash. Of the cash purchase price, $1100 was taken from the mother's bank account, $700 was contributed by Albert and $1950 was furnished by Frank. This property was later sold and the cash proceeds of said sale were deposited in the joint bank account of Frank and Albert. They continued to purchase and sell property in this manner while Frank yet resided in Ohio, and, during the period from 1925 to 1932, Albert, who was engaged in the real estate business in Chicago, made numerous loans and had various real estate transactions. These transactions continued with Albert using the money which was obtained from Frank or from funds derived from sales of property belonging to Frank and himself, jointly. In the latter part of 1931 Frank told Albert to look for a summer resort property in which they could establish their sick brother, Fred. Albert looked around for some time and finally, on March 26, 1932, the resort property, now in controversy here and known as Eagle Point Resort, was purchased for $9500 from one Belle Kanney, who executed a deed to Albert dated March 26, 1932, and recorded on March 29, 1932, in the recorder's office in Lake county, Illinois. This property, on March 28, 1932, was conveyed by Albert to his mother, Anna Staufenbiel, and on the same date she conveyed the property to Albert and Frank as joint tenants. Frank continued to live in Ohio and Albert moved into the resort property, which he operated in addition to looking out for other matters pertain-

ing to the joint holdings of the two brothers. Shortly thereafter disputes arose between the two brothers as to the handling of their properties, and after the death of their mother, in June, 1932, Frank ceased sending money home regularly as he had done in past years.

The evidence discloses that the brothers continued in their disagreement until October 24, 1932, when an agreement was entered into in writing which was signed by both Frank and Albert. This agreement set up the disputes between the brothers and their desire to adjust all matters between them. The agreement, so far as is important here, provided that the parties should continue to hold the Eagle Point Resort property as joint tenants; that Albert should furnish Frank with a statement of the income of the property and any necessary disbursements, and account for half of the net proceeds; that all past due interest should be paid up immediately, and that the parties should equally share expenses thereafter.

After the execution of the agreement of October 24, 1932, Frank returned to Ohio and Albert stayed in Chicago and continued to manage the property. Frank continued to send money to Albert to pay bills, and in April, 1933, he sent a check to Albert in order for him to open the summer resort. In August of the same year he sent money to pay the interest on the second flat in the amount of $210 and checks for various other amounts. It is apparent at this particular time that Albert was acting for Frank in carrying on the business. This relationship continued and it appears that, in 1934, Frank, who had married and was having some trouble with his wife in Ohio, returned to Chicago on May 10, 1934, and told his brother he was considering resigning his position. The brothers then went to Cleveland and after their return, according to Frank's testimony, they went to the office of an attorney on May 16, 1934, and told him to draw a contract whereby Albert would buy Frank's interest in the property. Frank

testified that this agreement was signed on May 16, 1934, and not on May 10, 1934; that after the contract was signed, in a discussion with Albert as to certain mortgages which were to be executed to complete the deal, Albert refused to go through with the transaction. Frank further testified he did not sign any deeds on that day and was not present in the attorney's office on May 10, 1934, and did not appear before Richard C. Murphy, a notary public, on that day or any other time; that he did not receive $500 from Albert on that day and never received any money prior to or after the agreement made with Albert. He claims that several years later, in May, 1938, at the request of Albert, he signed two blank deeds after Albert told him certain parties were willing to take over certain properties; that he never received any money from the sale and that in July of the same year he again spoke to Albert about changing the deeds to property which was held in joint tenancy so that they would be held between them as tenants in common.

It appears from the evidence that the deed to the resort property, which bears the date of May 10, 1934, conveying the property to Albert, was not recorded until July 25, 1938.

Albert testified that Frank was having trouble with his wife and she was suing him for divorce and for that reason they went to the office of an attorney who drew up all the papers; that they were notarized and that he gave Frank $500 cash.

The question for determination centers around the execution of the contract, release and deed bearing date of May 10, 1934. The attorney in whose office defendant contends the papers were prepared gave evidence to the effect that he had no independent recollection of the transaction but that it was his impression that the contract was carried out. It is understandable that the details would escape his memory after an elapse of some six years. Much contradiction and confusion appears from the record.

It is urged that equity will not, at the suit of the grantor, set aside a conveyance of property made to hinder or defraud creditors; that the evidence in the record reveals that on May 10, 1934, which was the date certain instruments were executed, including the purported deed, plaintiff had only one thought in mind and that was to place his property beyond the reach of his creditors. There can be no question about the legal principle involved and this court has often held as a general rule, subject to some exceptions, that when parties are concerned in illegal agreements they will be left without remedy against each other, provided they are *in pari delicto*. In such cases the law will refuse to aid either party, but leaves them where it finds them. Such rule is applicable to executed transactions as well as to executory and is enforced in courts of law as well as courts of equity. This court, in the case of *Jolly* v. *Graham*, 222 Ill. 550, at page 554, said: "The law will not permit a party to deliberately put his property out of his control for a fraudulent purpose and then through the intervention of a court of equity, regain the same after his fraudulent purpose has been accomplished. And this rule applies not only to him, but to his heirs and assigns." Facts and circumstances are in evidence in support of defendant's position. On the other hand, there is evidence to the effect there were no creditors to be defrauded in 1934 and that plaintiff had made settlement with his wife before he left Cleveland, in 1934, all of which presented an issue of fact on this matter. If plaintiff did execute and deliver the deed for the purpose of defeating his wife's rights in his property, a court of equity will not interfere at his request to set the deed aside. However, if the court below was correct in its findings, that the deed dated May 10, 1934, which was recorded July 25, 1938, from Frank G. Staufenbiel to Albert C. Staufenbiel, conveying the resort property, was never delivered by Frank G. Staufenbiel to Albert C. Staufenbiel,

nor was there any intention to deliver said deed, but that said Albert C. Staufenbiel procured said deed in an unknown manner, we do not see how it could be said there was a conveyance of property to hinder or defraud creditors. This, of course, brings us to the crux of this case as to whether or not the chancellor erred in finding from the evidence that the deed was never delivered nor was there any intention to so deliver, and decreeing that the purported deed of conveyance be set aside and declared void as against the plaintiff, and that the defendant, Albert C. Staufenbiel, forthwith deliver up said deed to be cancelled by the clerk of the court.

It is urged by counsel for plaintiff that, at the time of the transaction, a fiduciary relation existed as between the plaintiff and his brother, while it is contended by the defendant that no such relationship existed at the time of the transaction on May 10, 1934, and that such contention is entirely inconsistent with the proof made in behalf of the plaintiff in the trial court.

Plaintiff cites the case of *Albrecht* v. *Hunecke*, 196 Ill. 127. This was a case in which one Emma Albrecht filed a suit for partition and accounting, and the cancellation of any conveyances made by her affecting her interest in certain lands in which she claimed title as a tenant in common with her brother; that she had been informed that her brother claimed to have some paper or papers releasing her interest in the premises for a certain sum, and that she did not knowingly sign any paper or papers affecting her title to the premises, and that if defendant held such papers they were obtained by fraud, circumvention or misrepresentation. It was contended in that case that there was a fiduciary relation existing between the plaintiff and defendant and that the defendant obtained the deeds by virtue of such relationship; that the burden was on the defendant to show that the contract was reasonable, fair and for an adequate consideration, and if

he failed to establish such facts and that the contract was beneficial to her, it must be set aside. This court, in that case, at page 131, said: "but a fiduciary relation does not arise merely from the fact that parties are tenants in common of real estate or because they are brother and sister. Ordinarily, tenants in common may deal with each other respecting the common property, and the law does not assume that a purchase by a brother from a sister is fraudulent merely on account of the relationship. The question whether there is a fiduciary relation between such parties so that confidence is reposed by one in the other, will depend upon all the facts and circumstances of . the particular case." It is significant, as pointed out in the above case, that the question of whether there is a fiduciary relationship depends upon all the facts and circumstances of the particular case. This has been the holding by this court in many cases not necessary to be cited.

Defendant contends the evidence clearly shows the plaintiff and defendant were not on friendly terms, that neither trusted the other and that they did not enter into a simple business transaction without being surrounded by lawyers, and that the plaintiff's pleadings and proofs established that the money was sent by plaintiff to his mother. Counsel for plaintiff contend that the evidence conclusively shows that while the plaintiff lived in Cleveland permanently from the year 1919 to 1934, he consistently sent home monthly checks to his mother; that said money was used by Albert to buy real estate which was taken in the joint names of plaintiff and defendant, and that the particular real estate in question was purchased with money furnished by plaintiff and the transactions during this period were such that a fiduciary relationship existed; that this was further confirmed by a written agreement of the parties, dated October 24, 1932. An examination of this instrument reveals that, whatever differences the parties might have had with reference to their respective interests,

they agreed amicably and did, by said instrument, adjust all of said matters to their satisfaction; that Albert was given complete charge of the operation of the said property and was to account to plaintiff for one half of the net income of the property in question, rendering statements and remittances monthly thereafter. At this particular time the defendant was living in Chicago, where the property was located, while plaintiff was a resident of Cleveland, Ohio.

We do not see how it could reasonably be said that, under the terms of this contract, considering all the other matters pertaining to the handling of the various properties between the brothers thereafter, a fiduciary relation did not exist. A fiduciary relation exists in all cases in which there is confidence reposed on one side and a resulting superiority and influence on the other. It is settled law that courts of equity will not set any bounds to the facts and circumstances out of which a fiduciary relationship may spring. The fiduciary relationship, with its legal incidents, includes not only all legal and technical relations such as guardian and ward, attorney and client, principal and agent and the like, but it extends to every possible case in which a fiduciary relationship exists in fact, and in which there is confidence reposed on one side and resulting domination and influence on the other. (*Fisher* v. *Burgiel,* 382 Ill. 42; *Beach* v. *Wilton,* 244 Ill. 413; *Kosakowski* v. *Bagdon,* 369 Ill. 252.) The relationship need not be legal but it may be either moral, social, domestic, or merely personal. *Fisher* v. *Burgiel,* 382 Ill. 42; *Seeley* v. *Rowe,* 370 Ill. 336; *Mors* v. *Peterson,* 261 Ill. 532; *Roby* v. *Colehour,* 135 Ill. 300; *Feeney* v. *Runyan,* 316 Ill. 246.

When a fiduciary relationship is established, the burden is on the one profiting by the transfer of property to show that it was procured fairly and without the exercise of undue influence. If such relationship existed at the time of

the transfers, then the transactions are deemed to be presumptively fraudulent and will be set aside, unless the one in whom the confidence and trust was reposed establishes their fairness by clear and convincing proof. *Fisher* v. *Burgiel,* 382 Ill. 42; *Children's Home of Rockford* v. *Andress,* 380 Ill. 452; *Seeley* v. *Rowe,* 370 Ill. 336; *Mors* v. *Peterson,* 261 Ill. 532; *Thomas* v. *Whitney,* 186 Ill. 225.

Under this state of the record the burden is on the defendant to establish by clear and convincing proof the fairness of the transactions or transfers claimed to have been made to him by the plaintiff. The transactions consist of a contract between the parties, a release by plaintiff to defendant and a deed made in conformity to the terms of the contract, all of the papers bearing the date of May 10, 1934, although the purported deed which it is claimed was executed on that date was not recorded until July 25, 1938. It is our judgment the record supports the proposition that, at the time of the execution of these purported instruments, there was a fiduciary relationship existing and the burden was on the defendant to show the fairness of the transaction by clear and convincing proof. We do not think the proof offered in behalf of the defendant was sufficient to overcome the presumption, even though it could be said from the evidence that the deed was delivered.

The chancellor found that this deed conveying the resort property was never delivered by Frank G. Staufenbiel to Albert C. Staufenbiel nor was there any intention to deliver said deed, but that said Albert C. Staufenbiel procured said deed in an unknown manner. Counsel for defendant cite a number of cases in support of the proposition that a deed executed, acknowledged and recorded by the grantee is presumed to be delivered and the evidence to overcome this presumption must be clear and convincing. We are in accord with that general proposition, but the question of the delivery of a deed is largely one of intention as evidenced by the surrounding circumstances. There

must be a delivery of a deed of conveyance by the grantor and an acceptance thereof by the grantee in order that such deed pass title, but what amounts to a delivery is largely a question of intention, as evidenced by all the surrounding facts and circumstances. What amounts to a delivery depends upon the facts and circumstances of each particular case, and, as has often been stated by the courts, is a mixed question of law and fact. (*Kelly* v. *Bapst,* 272 Ill. 237.) As the intent of the grantor is controlling, the mere transfer of a deed from the grantor's possession to that of the grantee without the former's consent conveys no title. Such a deed has been said to be of no more effect than if it were a forgery. (*Schultz* v. *Schultz,* 274 Ill. 341; *Felix* v. *Patrick,* 145 U. S. 317.) In the case of *Stiles* v. *Probst,* 69 Ill. 382, it was held that the prerequisite essential to the delivery of a deed is that the deed or instrument in question should be understood by the parties to be complete and ready for delivery. *Schultz* v. *Schultz,* 274 Ill. 341.

An examination of the evidence bearing on this transaction reveals certain significant circumstances: In particular, the failure to record, until 1938, the deed which, it is claimed by defendant, was executed and delivered on May 10, 1934; the evidence showing the continuance of joint control and operation of the property after the claimed execution and delivery of the deed; and the consideration of $500 for property worth many times that amount which the plaintiff testified positively he never received. In the cross-examination of Albert, as to whether or not the $500 was paid by check or by cash, he replied: "Cash." When asked as to where the cash came from he stated he had it hidden several places at his home. The further testimony of Albert that the quitclaim deed was the only document executed at the time, and his admission later, when he was shown the agreement, that there were others, no doubt were considered by the chancellor. It is not denied that

the defendant, in his testimony, was confused, but counsel offer as an excuse that a great many immaterial and irrelevant matters, which were included in the numerous hearings before the master and which covered over 600 pages of the transcript, were involved and it was no wonder the defendant might have been confused. To point out all of the discrepancies and inconsistencies of the testimony in this record would unduly extend this opinion. We have, however, examined the testimony as to numerous transactions between the parties and the particular transaction involved in this litigation.

The master heard this testimony which consisted of 2200 pages with 250 exhibits and made a report of his findings. The report was approved by the chancellor. While his findings of fact do not carry the same weight as the verdict of a jury or findings of a chancellor where the witnesses have testified before him, yet the master's findings are entitled to due weight on a review of the cause. (*Mruk* v. *Mruk*, 379 Ill. 394; *Keuper* v. *Heirs of Mette*, 239 Ill. 586.) His conclusions as to the facts in this case have been approved by the chancellor. In that situation we are not justified in disturbing the findings unless they are manifestly against the weight of the evidence. (*Mruk* v. *Mruk*, 379 Ill. 394; *Pasedach* v. *Auw*, 364 Ill. 491; *North Side Sash and Door Co.* v. *Hecht*, 295 Ill. 515; *Klekamp* v. *Klekamp*, 275 Ill. 98.) From a careful examination of the evidence we are unable to so find.

It is our judgment the decree of the chancellor is supported by the evidence, and we will not interfere with his conclusion.

*Decree affirmed.*