(No. 31293.

PATRICIA KESTER *et al.,* Appellees, *vs.* BERNICE M. CRILLY, Appellant.

*Opinion filed March 22, 1950.*

426

FRANK MOLAND, of Chicago, for appellant.

HARRY J. BUSCH, and SEYMOUR RADY, both of Chicago, (MYER H. GLADSTONE, of counsel,) for appellees.

Mr. Justice Wilson delivered the opinion of the court:

The plaintiffs, Patricia Kester and Mary Kelly, brought an action in the circuit court of Cook County against the defendant, Bernice M. Crilly, to establish a constructive trust with respect to an improved parcel of real estate in Chicago, and for other relief. The master to whom the cause was referred found the issues for defendant and recommended a decree accordingly. From the decree of the chancellor setting aside the master's report and ordering defendant to convey an undivided one-third interest in the property to each plaintiff, defendant prosecutes a direct appeal, a freehold being necessarily involved. The decree appealed from is restricted to a determination of the rights of the parties in the real estate.

Plaintiffs and defendant are sisters and the only living children of James C. and Marguerite Crilly. The property involved, a five-room frame bungalow, was formerly owned by their parents, as joint tenants, and constituted the family home. Mary married in 1935, and Bernice and Patricia continued to live with their parents. In 1943, James Crilly suffered a cerebral hemorrhage which left him partially paralyzed and an invalid. He was unable to dress himself and, although he could walk a little or ride in an automobile, he had to be watched. His paralysis affected his speech and it was difficult for him to talk.

Marguerite Crilly died on January 22, 1945, and James Crilly, as surviving joint tenant, became the sole owner of the property. He was greatly affected by the loss of his wife and appears to have been under the care of a doctor. He cried frequently, seldom spoke and, when friends came to visit, would do little more than exchange greetings. For a long time, he even refused to listen to the radio.

Mary, Bernice and Patricia were about thirty, twenty-seven and twenty-four years of age, respectively, when their mother died. Very shortly thereafter, Bernice and Patricia opened a joint checking account. They deposited their

own pay checks and their father's pension and other checks in this account and used it to operate the household.

On the afternoon of January 28, 1945, the first Sunday after Marguerite Crilly died, James Ronan, a lawyer, appeared at the house at the request of Patricia and as an accommodation to her employer. Patricia stated that Bernice had asked her to obtain a lawyer. Ronan received no fee for his services and was the only disinterested witness at the trial. He testified that all three sisters were present; that James Crilly, dressed in a bathrobe and looking very ill, sat in the dining room, cried frequently, and did not participate in the discussion; that Patricia did most of the talking; that he was informed of their intention to use the proceeds of their mother's insurance (payable to their father) to discharge the mortgage indebtedness on the house; that Bernice asked a number of questions; that either Patricia or Bernice, or both, requested him to prepare deeds transferring title to the real estate to Bernice and James Crilly, as joint tenants; that, apparently, they had reached an understanding about the matter prior to his arrival, and that there was no discussion as to the disposition of the property upon the death of their father.

The accounts of the meeting given by Patricia and Mary are substantially the same as Ronan's, except for their mistaken impression that this meeting took place on the second Sunday following their mother's death and their testimony that Bernice reiterated earlier promises to share the property equally with them upon the death of their father, which had induced them to consent to Bernice's demand that title to the property be placed in herself and their father, as joint tenants. Mary testified as to several prior conversations and promises by Bernice, all out of the presence of their father. Patricia recounted two conversations with Bernice prior to Ronan's first visit, the first, "I think maybe three or four days after my mother died or after the funeral," and the other, "Oh, I would say about a week

or two after my mother died." In substance, Patricia stated that these were two of several conversations with Bernice relative to the real estate; that their father was present; that each time Bernice brought up the subject and stated the property should be placed in her name, as the oldest unmarried daughter living at home, because, if it became necessary to convert the property into cash to care for their father in a hospital, it would be simpler if only one signature were required, and that Bernice promised she would divide the property equally with her sisters upon the death of their father. She added that Bernice also wanted to be named the beneficiary in their father's insurance policy and promised to share the proceeds in the same manner. When asked about her father's part in these conversations, Patricia stated he would usually cry and say, "Whatever you decide on is all right with me."

Bernice denied she was present during Ronan's first visit, denied that Mary was at the house on the first Sunday after their mother died, and denied that she had ever promised her father or her sisters she would divide the property and the insurance proceeds equally with Mary and Patricia. Bernice testified that, on Sunday afternoon, January 28, 1945, only she, Patricia, and their father were at home; that he directed them to open a joint checking account the next day; that he asked Patricia to arrange for a lawyer, and that he then told Patricia he wanted the real estate placed in his name and Bernice's, as joint tenants, saying that was the way he and their mother had always wanted it. Bernice did not testify as to any other conversation relative to the conveyance of the family home to her as a gift.

On Sunday, February 4, 1945, Ronan stopped at the house briefly to have the deeds signed. Only Patricia and her father were at home. Ronan testified that Crilly, although looking better, still had the appearance of a sick man, was unsteady and spoke very little. Ronan explained the deeds to him and asked if they were drawn the way he

desired the transfer of title to be made. Crilly replied that, if it was satisfactory to Patricia, it was satisfactory to him. Thereupon, Crilly executed a quitclaim deed, dated February 3, 1945, to Patricia, and Patricia executed a quitclaim deed, dated February 5, 1945, to her father and Bernice, as joint tenants. Ronan took both deeds on the day actually executed, namely, February 4, and had them recorded the following day, February 5.

In addition to acting as intermediary in the transfer of title, Patricia drew the check in payment of the mortgage indebtedness on the property, procured the necessary forms to have Bernice named as the beneficiary of their father's insurance, and took the appropriate steps to have Bernice substituted for their mother as the joint owner with their father of certain bonds valued at about $500.

Bernice testified she first saw the deeds in July, 1945, when Ronan mailed them to Patricia. In the following month, Patricia married, her husband moved into the house, and she and Bernice terminated their joint bank account. On December 25, 1945, James Crilly died. As a result, Bernice became the surviving joint tenant and also received $4411 as the beneficiary of his insurance. About two weeks after their father's death, Bernice demanded and Patricia agreed to pay her the sum of $30 a month. Bernice insisted the money was paid as rent, but the first receipt so indicating is dated October 20, 1946, and by this time Bernice had retained a lawyer and was seeking to evict Patricia's husband. Patricia testified the money was paid for board and for the upkeep of the house, and it is undisputed that Bernice paid all taxes, fuel and repair bills, and other like items.

Early in February, 1946, Mary asked Bernice when she was going to divide the real estate and the insurance money. Bernice replied that everything belonged to her and she had no intention of sharing it. Because Mary threatened to sue, Bernice consulted Ronan. On February 10, Bernice gave

each of her sisters a check for $1500. Mary and Patricia stated the checks were delivered to them as gifts. Bernice denied this and testified she told her sisters that they had no claim on the real estate or insurance proceeds and, "I am giving you this money in case you feel you have any claim on any other personal property in the house." In any event, Bernice refused to make a settlement relative to the real estate, and, on December 3, 1946, Mary and Patricia commenced the present proceeding.

The principles governing the disposition of this litigation are well settled. Constructive trusts are divided into two general classes, one being where actual fraud is considered as equitable ground for raising the trust; the other being where the existence of a confidential relation and the subsequent abuse of the confidence reposed is sufficient to establish the trust. (*Brod* v. *Brod,* 390 Ill. 312; *Steinmetz* v. *Kern,* 375 Ill. 616.) The rule is uniformly recognized that where one acquires legal title to real estate upon an honestly made oral promise to convey to another and subsequently denies his promise or refuses to perform, in the absence of anything more, the law of express trusts applies, the Statute of Frauds (Ill. Rev. Stat. 1949, chap. 59, par. 9,) renders the oral trust void, and equity is powerless to create a constructive trust. (*Stein* v. *Stein,* 398 Ill. 397; *Miller* v. *Miller,* 266 Ill. 522.) It is equally true, however, that where it is shown a confidential relationship existed between the grantor and the grantee prior to the conveyance and the grantee refuses to perform his oral promise to convey to another, equity will raise a constructive trust. (*Jones* v. *Felix,* 372 Ill. 262; *Suchy* v. *Hajicek,* 364 Ill. 502.) The constructive trust arises out of the abuse of the confidential relationship existing independently of the oral trust and, consequently, there is no abridgement of the provision of the Statute of Frauds making oral trusts of lands void.

In general, in the law of constructive trusts, a confidential relationship exists in all cases when one person reposes trust and confidence in another who thereby gains a resulting influence and superiority over the first. (*Krieg v. Felgner,* 400 Ill. 113; *Brod v. Brod,* 390 Ill. 312.) The relationship may exist as a matter of law, as between principal and agent, guardian and ward, attorney and client, and the like, or it may be moral, social, domestic, or even personal. (*Hensan v. Cooksey,* 237 Ill. 620; *Irwin v. Sample,* 213 Ill. 160.) Where the relationship does not exist as a matter of law, it must, however, be proved by clear and convincing evidence in order to establish a basis for raising a constructive trust. (*Clark v. Clark,* 398 Ill. 592; *Galvin v. O'Neill,* 393 Ill. 475.) Factors to be taken into consideration are degree of kinship, if any, disparity in age, health, mental condition, education and business experience between the parties, and the extent to which the allegedly servient party entrusts the handling of his business and financial affairs to the other and reposes faith and confidence in him. The mere existence of a confidential relationship prohibits the dominant party from seeking any selfish benefit during the course of the relationship and affords a basis for fastening a constructive trust upon property so acquired. Where a confidential relation exists, the presumption obtains that the transaction complained of resulted from influence and superiority and the burden rests upon the grantee to show that it was fair, equitable and just and did not proceed from undue influence. *Schueler v. Blomstrand,* 394 Ill. 600; *Brod v. Brod,* 390 Ill. 312.

In the case at bar, upon the trial and on appeal, both parties have considered the primary issue to be a confidential relationship between Bernice and her sisters. The issue has been misconceived. Patricia was a mere intermediary in the transfer of title and the controlling relationship was that existing between James Crilly, as grantor, and Ber-

nice, as a grantee. The allegations of the complaint, however, are broad enough to charge a confidential relationship between Bernice and her father, there is evidence on this issue, and the chancellor found that "there existed between plaintiffs, James C. Crilley and defendant a very close confidential relationship," and that James Crilly conveyed the property to Bernice in consideration and in reliance upon her promise to him and her sisters to share the property equally with her sisters upon his death. The appeal may thus be decided upon the merits.

The record makes it abundantly clear that, at the time the deeds were executed, James Crilly was a partially paralyzed invalid suffering from great emotional distress caused by the recent death of his wife; that he was under the care of a doctor and could not be left alone; that he relied upon his two then unmarried daughters with whom he lived to handle his business and financial affairs; that he displayed little or no interest in personal affairs of vital importance to himself, as evidenced by the fact that he had no conversation whatever with Ronan on the occasion of his first visit to the house, and that he reposed both faith and confidence in Bernice and Patricia to the extent that whatever they decided upon about the property was agreeable to him. It follows, therefore, that plaintiffs successfully sustained the burden of proving that a confidential relationship existed between Bernice and James Crilly. While the evidence also tends to disclose a confidential relationship between Patricia and James Crilly, this is immaterial since only Bernice is charged with violating the trust and confidence reposed.

The question remains as to the circumstances under which Bernice acquired her interest in the property. To sustain the burden of proving that the transaction was fair and equitable and did not result from an abuse of trust and confidence, Bernice relies solely upon her own testimony as to a single conversation purported to have occurred

definitely on Sunday afternoon, January 28, 1945, during which her father indicated an express intention to convey a joint interest in the property to her as a gift. The fact that she was not present during the short time it took her father and Patricia to sign the deeds lends some support to her testimony. On the other hand, Patricia flatly denied that the alleged conversation took place and her testimony is supported by irrefutable evidence that Ronan first visited their home on the afternoon of Sunday, January 28, 1945, the same afternoon the conversation as related by Bernice is supposed to have taken place. Bernice's testimony is further weakened by her denial that she was present upon the occasion of Ronan's first visit, whereas Mary, Patricia and Ronan testified that she was present and participated in the discussion.

While the fact that Ronan's first visit occurred on January 28, 1945, also reflects on Patricia's testimony as to her sister's promises to share the real estate, it should be observed Patricia testified as to several conversations with Bernice and was not particularly definite as to dates. In addition, inherent evidence of the truth of Patricia's testimony is to be found in the fact that she played a prominent part in transferring almost all her father's property into his name and Bernice's as joint tenants. It is almost inconceivable that Patricia would voluntarily have assisted in placing all the property in Bernice's name in the absence of a promise by Bernice to hold her interest as a joint tenant for the benefit of their father during his lifetime, and, upon his death, to share the property equally with her sisters. Furthermore, although the purpose of Bernice's payments of $1500 to Mary and Patricia is disputed, the fact that each payment was almost exactly one third of the insurance proceeds of $4411 received by Bernice lends support to the testimony that Bernice promised to share the real estate and the insurance money equally with Mary and Patricia.

The existence of a confidential relationship between Bernice and her father created a presumption of influence and cast upon her the burden of showing that she did not abuse or betray the trust and confidence thus reposed in her. This, she failed to do. The chancellor's finding that James Crilly caused the real property to be placed in the names of himself and Bernice, as joint tenants, in reliance upon her promise to share the property equally with her sisters upon his death is supported by the manifest weight of the evidence.

The decree of the circuit court of Cook County is affirmed.

*Decree affirmed.*