(No. 34471.—

ANNA C. KAPRAUN *et al.,* Appellants, *vs.* PHILIP H. KAPRAUN *et al.,* Appellees.

*Opinion filed November 20, 1957.*

EDWARD ZUKOSKY, of Wenona, and WALTER C. OVER-
BECK, of Henry, for appellants.

ROBERT T. SWENGEL, of Henry, for appellees.

Mr. JUSTICE HOUSE delivered the opinion of the court:

The plaintiffs, Anna C., Bertha P., and Karl A. Kapraun, instituted an action in the circuit court of Marshall County against Philip H. Kapraun, individually and as executor, his wife, Agnes C. Kapraun, and his brothers, Edward W. and Anton Kapraun, to establish a constructive trust on 80 acres of land and for accounting and partition. This appeal is from the decree approving the master's report recommending that the complaint be dismissed and is properly directed to this court since a freehold is involved.

The parties are the children and only heirs of Frank F. Kapraun who died April 1, 1953, and his executor. The suit involves an 80-acre tract sold by the decedent to Philip and his wife on January 3, 1949, by a contract of that date and conveyed to them by deed dated June 7, 1949.

It is contended by plaintiffs that a fiduciary relationship existed for several years before and after the date of sale between decedent and Philip and his wife, and that the purchase price was disproportionate to the true value of the land.

This case presents a rather unique situation. The plaintiffs produced no witnesses relative to the fiduciary relationship other than the principal defendants, Philip H. Kapraun and his wife, both of whom were called under section 60 of the Practice Act. In fact, the only other witnesses who appeared on behalf of the plaintiffs were three persons who testified relative to land values.

Constructive trusts are of two classes: one, where there is a fiduciary or confidential relationship and the subsequent abuse of that confidence; and the other, where actual fraud is a basis for raising a constructive trust. (*Stephenson* v. *Kulichek,* 410 Ill. 139; *Kester* v. *Crilly,* 405 Ill. 425; *Krieg* v. *Felgner,* 400 Ill. 113.) The plaintiffs lay their case under the first class, that is, where the relationship allegedly exists and is abused. We need, therefore, only direct our attention

to the evidence which tends to establish that class of constructive trust. In this type of case a recital of family background is practically a necessity.

The father accumulated 432 acres consisting of the 240-acre improved home farm, a 112-acre improved farm and the improved 80 acres in controversy, the latter having been purchased in 1941 at $125 per acre. In 1941 Frank sold the home farm to his son Karl, 160 acres thereof at $100 per acre and the remaining 80 acres, which adjoins the 80 acres in question, at $135 per acre. At the same time he sold to Philip the improved 112 acres at $150 per acre. Upon completion and payment of the purchase price of the farms, the father divided the proceeds among the two daughters plaintiff and his son Edward.

The decedent became a widower in 1922. He alternately lived with his sons, Karl and Philip, from 1937 through 1941. From then to November 20, 1946, he lived on the 80-acre farm with his daughters, at which time he had a controversy with them and returned to the home of Philip. About the same time he directed his daughters to leave the farm. Thereafter the father lived with Philip until February 10, 1951, during which time he was given lodging, meals, and medical and nursing care by Philip and his wife.

Shortly after the daughters left, they presented a claim to the father through their attorney. Anna claimed $3974.96, of which $2472.83 was for practical nursing and the balance for notes and interest. Bertha claimed $5194.58, of which $3078.25 was claimed for nursing and the balance for notes and interest. To meet the claims Philip voluntarily gave his father an amount equal to an additional $28 per acre on the 112 acres and Karl gave an additional $17 per acre on the 240 acres. With the funds thus raised, the father paid the claims of the daughters. About a week later Anna claimed an additional amount slightly over $500 which

Philip paid from his own funds. Philip was never repaid either of the amounts so advanced nor was any note or other evidence of indebtedness given to him.

We now proceed to the evidence with respect to the controversial sale. Philip testified that in November or December, 1948, his father asked him to purchase the tract. He stated that he did not want it. Finally, a week or 10 days before January 3, 1949, his father asked him to make an offer and he said that he would take it at $250 per acre. On January 3 he took his father to the office of a lawyer who prepared the contract. It provided a total purchase price of $20,000 payable $1800 at the time of its execution and the balance due on or before 5 years after date payable in installments, with interest at the rate of 4 per cent per annum, and the purchaser to pay taxes assessed subsequent to the year 1948. The contract also provided for forfeiture and retention of payments as liquidated damages in the event of default at the option of the seller.

Various payments of principal and interest were made thereon and on June 7, 1949, a balance of $13,000 remained. On that date the decedent executed a deed to Philip and his wife, and they in turn executed five promissory notes to the decedent totaling $13,000 and gave a mortgage to secure same. These notes were paid in installments with the final payment having been made on April 25, 1952.

The primary question presented is whether in fact a fiduciary relationship existed between the father, Frank F. Kapraun, and the defendants, Philip H. Kapraun and Agnes C. Kapraun. It is well settled that where a fiduciary relationship does not exist as a matter of law, but the parties seek to establish a constructive trust by parol evidence, the burden of proof is on the plaintiffs in the first instance to prove the existence of the fiduciary relationship by proof so clear, convincing, strong, unequivocal and unmistakable as to lead to but one conclusion. (*Kolze* v. *Fordtran*, 412

Ill. 461; *Compton* v. *Compton,* 414 Ill. 149; *Maley* v. *Burns,* 6 Ill.2d 11.) A fiduciary or confidential relationship, as used in a case of this nature, is a very broad one and the factors to be taken into consideration are difficult to define precisely. The relationship may exist as a matter of law or it may be moral, social, domestic or purely personal. We have said that some of the factors to be taken into consideration are degree of kinship, disparity in age, health and mental condition, the relative education and business experience of the parties, and the like. *Kester* v. *Crilly,* 405 Ill. 425; *Stephenson* v. *Kulichek,* 410 Ill. 139.

The close relationship of the parties, the disparity in age and health and the fact that they occupied a common household are factors in this case to which we have given the closest scrutiny. While the father was 85 years of age, was in poor health and required medical attention and nursing care for several months each year, there is nothing in the record to indicate that his mental faculties were impaired. He paid taxes, wrote and indorsed checks, made most of his own deposits and took care of his investments and insurance. He managed the 80 acres up to the time of the sale without help. He required no assistance in the keeping of his books and the gathering of material for the preparation of his income tax returns. While some checks were drawn on the father's account by Philip and at least two checks were indorsed by the latter, these acts appear to have been the exception rather than the rule and were at the request and direction of the father. It is true that the attorney who prepared the contract was Philip's personal attorney, but the father contacted such attorney and made all arrangements with him in regard to drafting the contract. The exact terms and conditions were unknown to Philip until such contract had been drafted and placed in his hands for examination. In short, Philip assisted only in those physical things that a man of his father's age and

health could not be expected to do. His acts did not constitute a general agency but merely a special agency in isolated instances.

A fine relationship existed between this father and son. Philip housed, fed and nursed him without compensation although there was an oral agreement that he was entitled to be paid for such services. In addition, he drove his father to town to take care of the latter's business without complaint. He accepted deeds from his father reluctantly and not only meticulously met his obligations, but voluntarily paid an additional amount for the 112 acres originally purchased though he was not obligated to do so. This contrasts with the attitude of the daughters, two of the plaintiffs herein, who made a claim for nursing services and were paid.

The uncontroverted facts leading up to the sale indicate that the father knew exactly what he was doing. He approached his son Philip, asked him to make an offer for the tract and their conversations did not result in a sale for several months. The father retained counsel to prepare the contract, fixed his own terms for payment and submitted the document to his son for inspection. The son made the down payment and other payments totaling $7000 plus interest between the date of the contract and the deed. Plaintiffs suggest a question as to whether the down payment of $1800 was made but offered no proof to overcome the receipt signed by the father for that amount. No question was ever raised by the father about the payment of the several installments and interest on the contract nor the giving of the deed. He recognized the balance due by the acceptance of the notes for $13,000. Adequate proof appears in the record that all of the amounts of principal and interest were paid, most of them by checks.

We reach the inescapable conclusion that a fiduciary relationship, within the meaning of the law in this type of case, did not exist. Therefore, there is no presumption of

fraud or undue influence. The plaintiffs have wholly failed to prove that the defendants exerted undue influence or practiced fraud in the purchase of the 80 acres in question.

As heretofore noted, all of the evidence with respect to the alleged fiduciary relationship came from the two principal defendants called under section 60. Interrogation covered the whole range of this case. Plaintiffs do not question their competency but seem to make the point that they are not bound by the defendants' testimony. They point out that Philip testified upon initial examination that he did not handle his father's business affairs. Later he admitted drawing some checks on his father's account by signing the father's name with his name below, and delivering others—but only at the specific request of his father. Much ado is made of the fact that after his testimony that he had not indorsed any checks payable to his father, exhibits were introduced to show that two checks were so indorsed by him, one on August 3, 1948, and one on December 30, 1949, and he then admitted having indorsed them. We do not think this is significant. The two indorsements were made about six years prior to the hearing, and the memory of the witness could easily have been faulty upon such a trivial detail.

Obviously plaintiffs were not bound to vouch for the veracity of the testimony of the adverse witnesses and they could have introduced any competent evidence in direct contradiction. (Ill. Rev. Stat. 1957, chap. 110, par. 60.) However, they were bound by testimony of any adverse witness which stood uncontradicted and unrebutted. *Chance v. Kinsella,* 310 Ill. 515; *In re Estate of Donovan,* 409 Ill. 195.

There is a serious question as to whether plaintiffs could have prevailed in any event on the basis of inadequacy of consideration. Proof of the value of the land ranged from $200 to $365 per acre. Opinions as to real-estate values are fallible and vary among witnesses. An indication of

the inflationary tendency of the times can be gathered from the fact that the tract in question was purchased by the father in 1941 for the sum of $125 per acre and was sold by him 8 years later for $250 per acre. The court could take judicial notice of the fact that the inflationary tendencies continued beyond 1949 and, thus, the witnesses were testifying to a value as of several years previous and their judgment could easily have been influenced by the values existing at the time of the trial.

We find no error in the decree of the circuit court of Marshall County dismissing the complaint for want of equity, and the decree is affirmed.

*Decree affirmed.*