*In re* ESTATE OF JOHN A. KIERAS, Deceased (Stanley L. Kieras, Independent Adm'r, of the Estate of John A. Kieras, Deceased, Petitioner-Appellant, v. Ernest Kieras, Respondent-Appellee).

Third District   No. 3—87—0548

Opinion filed March 22, 1988.

J. Paul Aplington and Thomas L. McClintock, both of Aplington, Kaufman, McClintock, Steele & Barry, of La Salle, for appellant.

Herbolsheimer, Lannon, Henson, Duncan & Reagan, of La Salle, for appellee.

JUSTICE LUND delivered the opinion of the court:

Petitioner Stanley Kieras, as administrator with will annexed of the estate of John Kieras, deceased, filed a petition for a citation to discover assets against respondent Ernest Kieras, decedent's son, pursuant to section 16—1 of the Probate Act of 1975 (Ill. Rev. Stat. 1985, ch. 110½, par. 16—1). The circuit court of La Salle County granted the petition and issued the citation. The matter was heard in March and April 1987. The court subsequently ordered Ernest to pay $2,500 to the estate, and declared $47,006.58 in assets to be the property of Ernest. Stanley appeals on behalf of the estate.

Prior to 1977, the Kieras family consisted of John and Mary Kieras, and their four adult sons, Stanley, Raymond, Ernest, and Edward, all of whom were married. Stanley, Raymond, and Ernest, along with their families, lived near their father. Edward lived in Texas.

On March 23, 1977, Mary Kieras died. Shortly after her death, at

a family gathering in John's home, it was decided that Stanley's name would be added to his father's savings account. Shortly before his wife's death, John executed a will which divided his estate equally among the three sons living in Illinois, and Stanley was named as executor.

On February 19, 1981, John Kieras went with his son Ernest to J. Paul Aplington, an attorney with whom John had previously sought legal help. Aplington had prepared a new will, which John executed that day. The new will named Ernest as executor, but divided John's estate evenly among his four sons. That same day, John and Ernest went to the La Salle State Bank where John transferred his bank account into a new account in his name alone, removing Stanley's name from the savings account. The balance of the account on February 19, 1981, was $17,238.23. John Kieras also executed a bank authorization card allowing Ernest to "sign or endorse checks, notes, drafts, etc., for deposit to my account, or otherwise, and to issue and sign checks or receipts against" John's savings account.

On July 13, 1983, Ernest took John to attorney Thomas R. Clydesdale, who was Ernest's attorney. John had never previously transacted any business with Clydesdale. Clydesdale prepared a deed whereby John conveyed his homestead real estate to Ernest, reserving a life estate to himself. Shortly after John's death, Ernest sold the real estate for a net sale price of $31,784.68.

On July 18, 1983, John Kieras, again in Ernest's company, withdrew, in cash, the balance of his savings account at the La Salle State Bank. The amount was $18,361.37. Later that same day, John and Ernest went to the Colonial Trust and Savings Bank in Peru, and John opened a new savings account in the joint names of Ernest Kieras and John Kieras. Two thousand five hundred dollars were put into this account. John handed $15,800 to Ernest, and Ernest deposited the money at the Colonial Trust and Savings Bank in an account in his own name. John Kieras took the remaining $61.37 home with him.

In May 1984, John Kieras was hospitalized. He remained hospitalized for three weeks, after which he was transferred to a nursing home. On May 29, 1984, he signed a power of attorney giving Ernest control of his affairs. Attorney Clydesdale prepared the document.

John Kieras died on August 24, 1984. His only assets were the household furnishings, certain cash John kept in a "tin box," and certain life insurance policies payable to Ernest. Ernest used the joint account of $2,500 plus the proceeds from the two insurance policies to pay the expenses of John's funeral. Ernest took the household fur-

nishings and the tin box. Ernest sold some of the furniture. He also kept some of the furniture and gave some to his children.

Ernest declined to act as executor of his father's estate even though named by the will as executor. The other three sons petitioned for the appointment of Stanley as administrator with will annexed, and the petition was granted on December 5, 1984. On July 17, 1985, Stanley filed a petition for citation to discover assets against Ernest, and the court granted the petition that same day. A citation was issued directing Ernest to appear and answer questions regarding the assets in his possession formerly belonging to his father, and the court heard the matter in March and April 1987. Stanley alleged that the money from the bank account and the transfer of John Kieras' homestead to Ernest were not meant to be gifts. Ernest testified that the two transfers were gifts.

The question is whether or not a fiduciary relationship existed between Ernest and John. The parties stipulated that the bank account and the proceeds from the sale of the house totalled $47,006.58. The parties also agreed that the furniture sold outside the family brought $300.

The trial court issued an opinion on June 9, 1987, which stated, in part:

> "John Kieras died on August 24, 1984. Shortly before his death Ernest Kieras took possession of a 'tin box' in the home of John Kieras which contained some amount of cash. ***
>
> *** The respondent states that he has no knowledge of or record of the amount in the 'tin box'. There is no doubt that he was a fiduciary at the time he took possession of the 'tin box' and its contents. He knew that his father was seriously ill, that he had been named Executor of the Estate of John Kieras and that the estate was to be divided equally between himself and his three brothers."

The court found the tin box contained $2,500, which, together with the $300 from the sale of furniture, should be turned over to the estate. Mistakenly, Ernest was ordered to pay over $2,500 instead of the correct sum of $2,800.

The trial court expressly found that a fiduciary relationship did not exist between John and Ernest Kieras in July 1983 when John transferred the proceeds of his savings account and his house to Ernest. The court determined that John was managing his own affairs in 1983 and for some time thereafter. As to the authority given Ernest in 1981 to withdraw funds from John's savings account, the court found the authority was given as a convenience to John "in the

event of need." It was found that Ernest never used the power granted to him under the bank authorization card, and it was determined that the transfers to Ernest in 1983 were made by John of his own free will. A corresponding order was filed on July 14, 1987.

Stanley argues a fiduciary relationship existed between John Kieras and his son Ernest Kieras in 1983 when John transferred the bulk of his assets to Ernest. Stanley points to the bank authorization card Ernest signed in 1981 and argues this established a fiduciary relationship as a matter of law. Alternatively, Stanley asserts that Ernest's testimony showed a confidential relationship between himself and his father. Stanley argues that because a fiduciary relationship was created, all of Ernest's actions with his father must be considered suspect and subject to the requirements of a fiduciary duty.

Ernest responds by pointing out that he never used the power conferred by the bank authorization card, and, therefore, he never acted for his own benefit with the property that was entrusted to him.

■■ ■ Stanley misinterprets the law regarding fiduciary relationships. It is clear that a principal-agency relationship is a fiduciary relationship as a matter of law. (*Stone v. Stone* (1950), 407 Ill. 66, 77, 94 N.E.2d 855, 861.) However, the fiduciary relationship exists for matters within the scope of the agency. (*Stone*, 407 Ill. at 80, 94 N.E.2d at 862; *Hickey v. Hickey* (1939), 371 Ill. 476, 481, 21 N.E.2d 579, 581; 3 Am. Jur. 2d *Agency* §210, at 714 (1986) ("An agent is not in a fiduciary relationship to his principal in matters in which he is not employed unless the nature of the agency is such as to create a confidential relationship in all matters").) Although Ernest was given the authorization to withdraw funds from his father's savings account, that power was never used. When the savings account was closed, John Kieras personally withdrew the money from the La Salle State Bank accompanied by his son Ernest. While certain cases cited by Stanley contain language to the effect that all of the transactions between fiduciaries are suspect, the facts do not indicate a fiduciary relationship based on principal-agency. Rather, if a fiduciary relationship existed, the facts more properly fit a fiduciary relationship established by virtue of a dominant party-subservient party relationship. See *Kester v. Crilly* (1950), 405 Ill. 425, 91 N.E.2d 419; *In re Estate of Trampenau* (1980) 88 Ill. App. 3d 690, 410 N.E.2d 918.

Stanley also argues Ernest's testimony showed he had control over John Kieras' financial affairs to such a degree that a fiduciary relationship was established as in a dominant party-subservient party relationship.

■■ ■ However, the relationship between parent and child is not fiduciary as a matter of law. (*Chicago Land Clearance Comm'n v. Yablong* (1960), 20 Ill. 2d 204, 207, 170 N.E.2d 145, 147.) A gift is presumed when a parent transfers property to his child. (20 Ill. L. & Prac. *Gifts* §30 (1956); see also *Varap v. Varap* (1966), 76 Ill. App. 2d 402, 413, 222 N.E.2d 77, 83-84 ("[W]hen a parent purchases property and title is taken in her name and that of her children there is a presumption that the transfer was a gift to the children").) On the other hand, a gift to one occupying a confidential or fiduciary relationship to the donor, even in the case of parent and child, is presumed void as obtained by improper or undue influence or means. (20 Ill. L. & Prac. *Gifts* §31 (1956); see also *In re Estate of La Rue* (1964), 53 Ill. App. 2d 467, 476, 203 N.E.2d 47, 51 ("Where a fiduciary relationship exists, even as between parent and child, a gift is never presumed, but rather the burden of proof is on the party claiming there was a gift to establish a gift in fact existed").) The fiduciary donee has the burden of proving the validity of the gift and that the gift was obtained without undue influence. *Stephenson v. Kulichek* (1951), 410 Ill. 139, 147, 101 N.E.2d 542, 546; see *Franciscan Sisters Health Care Corp. v. Dean* (1983), 95 Ill. 2d 452, 448 N.E.2d 872 (as to the effect of presumption in will cases and the party charged with the burden of proof or burden of persuasion).

■ Fiduciary relationships are created as a matter of law in certain cases, such as that of the relationship of principal and agent. A fiduciary relationship also arises where one party asserts confidence in another with the resulting dependence and reliance on the other as the dominant personality. The dominant party accepts the confidence and maintains a resulting superiority and influence over the subservient party. (*Stephenson*, 410 Ill. at 144-45, 101 N.E.2d at 545.) It is a relationship founded in trust given and accepted, and the one in whom confidence is placed is bound, in equity and in good conscience, to act in good faith and with due regard to the interest of the one reposing the confidence. 12 Ill. L. & Prac. *Contracts* §94 (1983).

■ In *Chicago Land Clearance Comm'n v. Yablong* (1960), 20 Ill. 2d 204, 207, 170 N.E.2d 145, 147, the supreme court held no fiduciary relationship existed between a mother and son based on the mother's bare assertion. In so holding, the court stated:

"To set aside a conveyance because of a fiduciary relation requires proof of facts establishing such a relationship by evidence that is clear and convincing and so strong, unequivocal and unmistakable as to lead to but one conclusion. (*Stewart v. Sunagel*, 394 Ill. 209; *McGlaughlin v. Pickerel*, 381 Ill. 574;

*Johnson v. Lane*, 369 Ill. 135.)" (*Yablong*, 20 Ill. 2d at 207, 170 N.E.2d at 147.)

In order for such a fiduciary relationship to exist where one does not exist as a matter of law, the facts must clearly indicate a dominant-subservient relationship between the parties. John Kieras' relationship with his sons, and with Ernest in particular, was testified to by Ernest and other family members.

Ernest was first called as a witness by Stanley, and in explaining why his father would give him the bulk of his father's estate as gifts, he testified that he took care of his father:

"Q. What have you done for your father?

A. Anything possible, everything. Took care of him; cut his grass; took care of the house; changed water tank; changed toilet. Water tank was broke. Anything and everything. Anything he wanted me to do. Took care of his house; the wife washed his clothes."

Ernest stated that all the brothers, except Edward, who lived out-of-State, helped with repairs to John's house over the years. However, Ernest stated that after his mother died, he visited his father every other day—more than his brothers did. Ernest acknowledged that Stanley did the weekly grocery shopping for his father, but testified that he took care of his father's finances from approximately February 1983 until his father's death. When his father had bills that needed to be paid, John would give Ernest cash to pay the bill, and Ernest would pay it. Ernest stated his father was still pretty self-sufficient in April 1983. John was able to move around the house, although slowly, and he needed the help of a cane. John did his own cooking and was aware of events going on about him.

In May 1984, Ernest had his father sign the power of attorney giving Ernest control over all of his father's affairs. He explained the document to his father, while his father was in the hospital. His father did not read it, nor was it signed in the presence of a notary. John signed the power of attorney from his hospital bed in Ernest's presence, and Ernest then had a notary affix a seal to the document.

Ernest knew at the time the second will was executed in 1981 that he was the new executor of his father's estate. He believed the power to withdraw funds from his father's savings account was to be used in case of emergency, such as if his father became ill.

Ernest denied saying anything negative to his father about Stanley that would have caused John to remove Stanley as executor from the will, or cause John to remove Stanley's name from John's savings account. Ernest stated that since 1981, John had complete

trust in him to handle John's financial affairs.

Later, when Ernest testified on his own behalf, he modified his testimony somewhat. He stated his father took care of his own financial affairs until he was hospitalized in May 1984, after which Ernest took care of his father's financial affairs. On cross-examination, Ernest denied saying he had handled all of his father's finances *since 1981*. In May 1984, Ernest took his father's "tin box" to his home.

Stanley testified that he helped his father and mother with their grocery shopping. Stanley and his wife lived one block away from his father and mother and had lived there since they were married in 1954. Stanley did the grocery shopping for his father almost from the time he and his wife were married. Ernest normally cut the grass for his father, and if there were minor repairs to be made, his father usually called Ernest. However, all three of the boys helped with major repairs.

Stanley stated he had a disagreement with his father regarding his father's bank book. After his mother died, Stanley testified the boys and John all decided to put Stanley's name on his father's bank account, and Ernest took part in this decision. Stanley was selected because he was the eldest son. Stanley testified that after his mother's death, he routinely paid his father's bills with cash from his father. Stanley also routinely helped his father with his banking. Stanley would drive his father to the bank where his father would deposit his pension checks. Somewhere around 1981, Stanley suggested that the bank book be updated, and, at that time, was told that Ernest had the bank book. Stanley testified that his father was tightlipped about his finances, and never again did he or his father bring up the fact that Ernest had the bank book.

Sophie Kieras, Stanley's wife, testified that she visited with her in-laws about once a week and stated John deferred to Ernest over Stanley for minor repairs to the house. Stanley routinely did his father's grocery shopping and helped his father with his banking.

Raymond Kieras, another of John's sons, testified that he maintained significant contact with his father, visiting his parents at least once a week. While his father was in the hospital and in the nursing home, Raymond came to visit once a day.

Mary Kieras, Raymond's wife, testified that she spent much time talking with her father-in-law. After her mother-in-law died, she would talk up to five times a day with her father-in-law by telephone. She helped to bathe her ill mother-in-law prior to her death, and she believed she had a special relationship with her father-in-law. She testified to several conversations with her father-in-law after the prop-

erty transfers were made to Ernest stating John expressed regret at having transferred his house and savings account to Ernest.

Lucille Kieras, Ernest's wife, testified that she and Ernest helped take care of her mother-in-law when she was sick. They also did some basic chores for John after his wife died, such as cutting the grass and cleaning his house.

Anton and Mildred Kieras, John's brother and sister-in-law, both testified stating that John called them every day after his wife died. John was lonesome and complained that his sons did not care for him or visit him. According to Anton and Mildred, John did not think highly of his daughters-in-law, Sophie and Mary Kieras. He favored Ernest, who seemed to be the only one that helped him. Anton testified that John implied to him that his property should go to Ernest.

Thomas Clydesdale testified that he had been an attorney for 49 years. He had spent 28 years in private practice and 21 years as a circuit judge and probate judge. He prepared the deed transferring John's house to Ernest. He explained to John the effect of transferring John's property to Ernest and suggested reserving a life estate. John appeared to understand the nature of the transfer and indicated his desire to make the transfer to Ernest. John also reserved a life estate. Clydesdale stated there was no undue influence exerted by Ernest in his office. Clydesdale acknowledged there was no specific discussion of how the transfer fit with John's estate plans.

As we have previously stated, the trial court determined there was no fiduciary relationship between John and Ernest at the time the real property and savings account proceeds were transferred in 1983.

The decision of the trial court as to the issue of whether a fiduciary relationship existed will not be disturbed on appeal unless it is against the manifest weight of the evidence. (*Staufenbiel v. Staufenbiel* (1944), 388 Ill. 511, 58 N.E.2d 569; *Fisher v. Burgiel* (1943), 382 Ill. 42, 46 N.E.2d 380.) As indicated by *Kester v. Crilly* (1950), 405 Ill. 425, 91 N.E.2d 419, and *In re Estate of Trampenau* (1980), 88 Ill. App. 3d 690, 410 N.E.2d 918, there appears to be a like use of terms, "confidential relationship" and "fiduciary relationship." The relationship was found to be present by the trial court in both of those cases. In determining whether the relationship exists:

> "Factors to be taken into consideration are degree of kinship, if any, disparity in age, health, mental condition, education and business experience between the parties, and the extent to which the allegedly servient party entrusts the handling of his business and financial affairs to the other and reposes faith and

confidence in him." *Kester*, 405 Ill. at 432, 91 N.E.2d at 423.

The trial court heard the evidence on these factors. The age and resulting physical limitations appear to be the factors weighing most heavily against Ernest. However, all of the factors in the present case are in sharp contrast to those in both *Kester* and *Trampenau*. John's mental condition appears to have been sound. He had close contact with his other sons. Indications are that he maintained an independence up to the time of his hospitalization. We conclude the trial court's determination was not against the manifest weight of the evidence.

Because we hold that no fiduciary relationship exists, it is not necessary to consider the other arguments on appeal. However, the trial court's mistaken provision for a $2,500 judgment rather than $2,800 must be corrected.

The judgment is modified to provide judgment adverse to Ernest in the sum of $2,800 rather than $2,500.

Affirmed as modified.

GREEN, P.J., and SPITZ, J., concur.