Margaret L. Clemens, Plaintiff-Appellee, v. Sandee Manufacturing Company, Defendant-Appellant.

Gen. No. 52,358.

First District, Fourth Division.

September 10, 1969.

Spangler & Greenberg, and M. G. Kaufman, of Chicago (Erwin H. Greenberg, of counsel), for appellant.

Ebers, Metskas & Bjorvik, of Chicago (Thomas S. Metskas, of counsel), for appellee.

MR. JUSTICE STAMOS delivered the opinion of the court.

Defendant, Sandee Manufacturing Company, appeals from a decree wherein the court approved the findings of the Master and entered judgment in favor of plaintiff, Margaret Clemens, in the sum of $29,330.70. Plaintiff cross-appeals from that part of the decree excepting from the Master's report interest on the sum awarded by the decree.

The principal issue presented for review is whether plaintiff is the owner of the proceeds of a certain life insurance policy issued upon the life of plaintiff's husband, James J. Clemens, deceased employee of defendant. The issue in the cross-appeal is whether the court erred in denying interest.

Plaintiff's amended complaint in substance averred that plaintiff was the wife of James J. Clemens who had been employed by defendant; that defendant provided insurance on the life of James J. Clemens as terms of his employment; that because of economics it was orally agreed between James J. Clemens and defendant that defendant would retain the incidents of ownership and be named as beneficiary; that defendant orally agreed that in the event of James J. Clemens' death it would pay the proceeds to plaintiff; that James J. Clemens has died and defendant has refused to deliver the proceeds to plaintiff. Plaintiff prayed that the defendant be declared to hold the proceeds in trust for plaintiff and to deliver the proceeds with interest to plaintiff from the date that defendant received the proceeds. Defendant's answer denied all the agreements alleged in the complaint,

denied that it held the proceeds in trust for plaintiff, and alleged that it was the owner of the policy and proceeds thereof.

Defendant is an Illinois corporation engaged in the business of manufacturing plastics. Its sole stockholder was Elmer Szantay, who was president of the company and a director from the date of the corporate organization to the date of his death on April 1, 1962. Prior to April 1, 1962, Hellmuth Lange and M. G. Kaufman were the other directors. Kaufman was also attorney for defendant. Lange was also Secretary and Assistant Treasurer.

Subsequent to April 1962, the board of directors consisted of M. G. Kaufman, Hellmuth Lange and Robert Wehrheim. The latter succeeded Szantay as President, and Lange became Treasurer and Secretary of the company.

James J. Clemens was sales manager for defendant, and had been so employed for about 11 years at the time of his death. Defendant paid Clemens a salary, bonus, paid vacations, expense-free car and insurance.

Through interrogatories and stipulation it was established that Szantay in September 1959 as president of defendant, negotiated the purchase of Security Benefit Life Insurance Company policy No. 4080659, insuring the life of James J. Clemens for $15,000 and $15,000 accidental death.

At the same time, Szantay took out a policy on his own life for $100,000 without double indemnity, and policies on the lives of Robert Wehrheim and Charles McGuinness, employees of defendant, for the sum of $15,000 with double indemnity. These policies were taken out through Bernard E. Lindquist of Lindquist-Burns Company.

The premium on the policy insuring the life of James J. Clemens was paid by defendant by borrowing against the cash surrender value of the policy and applying any accrued dividends on the policy toward the premium, and

paying the difference between the premium and the total of the amount borrowed and the dividends. The beneficiary of the policy was defendant.

On January 10, 1961, James J. Clemens received the following letter from defendant; received in evidence as plaintiff's Exhibit No. 1 and hereinafter referred to as the letter. Policy No. 4 referred to in the letter is the subject-matter of this litigation.

"January 10, 1961

"Dear Jim:

"We wish to confirm the insurance carried on you by your company.

"Policy #1—The Sandee Mfg. Co. has obtained $10,-000.00 Group Life Insurance for you with $10,000.-00 Accidental Death or Dismemberment benefits, as shown on your policy issued by Mutual Benefit Life Insurance Co. Your company is paying the full premiums on this insurance. (Plaintiff was the stated beneficiary under this policy.)

"Policy #2—Your company issued you also with a Group Accident Policy for $25,000.00 Accidental Death or Dismemberment benefits.

"No individual policies are issued for policy #2, inasmuch as the names of all executives are listed on the policy. You are covered for this insurance by Group Policy #9A BN 2817, by Indemnity Insurance Company of North America, your company is paying the full premiums on this insurance.

"Your beneficiary on this Policy #2 is the same as shown on Life Insurance Policy of Mutual Benefit Life Insurance Policy #1, a copy of which is in your possession. The accidental Policy of In-

demnity Insurance Co. (Policy No. 2) is in possession of Sandee Mfg. Co.

"Policy #3—You are also covered for $3,000.00 Life and Group Insurance by Aetna Life Insurance Co. Your contribution is .50 cents per week on this insurance. Your company pays the balance.

"Policy #4—You are insured for $15,000.00 Life Insurance and $15,000.00 Accidental Death or Dismemberment benefits with Security Benefit Life Insurance Co., Topeka, Kansas, policy #4080659. This policy is kept in force with two objectives:

"(1) Greatest maximum protection.
"(2) Lowest annual payout cost to Sandee Mfg. Co.

"Lowest annual payout cost is achieved by Company borrowing against cash value of policy to assist in premium payments. This payment method will be continued. Accordingly, in the event of payout on this policy, the payout would be reduced by the amount of loan outstanding.

## "RECAP OF INSURANCE

| "POLICY | LIFE BENEFIT | ACCI-DENTAL |
|---|---|---|
| "#1 Mutual Life | $10,000.00 | $10,000.00 |
| "#2 Indemnity | — | 25,000.00 |
| "#3 Aetna Life | 3,000.00 | 3,000.00 |
| "#4 Security Benefit | 15,000.00 | 15,000.00 * |
| | 28,000.00 | 53,000.00 |

"Total payout in event of accidental death at the present time would be approximately $80,000.00.

"* Reducing balance in time.

327

SANDEE MANUFACTURING COMPANY

"(S) Elmer Szantay
"Elmer Szantay, President

"This certifies that above policies are in full force and effect.

"(S) H. Lange
"H. Lange, Sec'y. Asst. Treasurer."

MARGARET L. CLEMENS, Plaintiff, testified as follows:
On February 14, 1961, plaintiff had occasion to discuss the letter with Szantay. This conversation took place during an air trip to Iowa. Plaintiff, her husband, four-year-old son, and Szantay were on the plane. Szantay brought up the subject of insurance when they were discussing litigation arising from the death of another employee wherein Mr. Clemens was involved as a witness on deposition. Szantay asked plaintiff if she had discussed the letter with her husband and plaintiff said yes. Szantay referred to the letter as "the letter that stated the policies that the company had taken on different employees." Szantay told plaintiff that the company wished to take this insurance out on its employees because Szantay did not want a repeat of the LaMere incident in which Mrs. LaMere was left practically penniless because of lack of insurance or foresight on her husband's part. (Mr. LaMere was a salesman for defendant.) Szantay said that although Sandee was named as beneficiary, the proceeds would be paid to plaintiff and to her alone; that in the event of her husband's death she would receive approximately $80,000 and plaintiff should not worry, she would be well taken care of. Szantay further related to plaintiff that the reason the amount he mentioned was approximately $80,000 was because the value of the No. 4 policy decreased as defendant borrowed against the cash value of it. This was

328

done for financial reasons, since it was a financial benefit to the company that defendant own the policy.

On April 1, 1962, James J. Clemens and Szantay died in an airplane crash. On April 6, 1962, plaintiff had a conversation with Lange in which he inquired if plaintiff had the letter regarding the insurance policies. Plaintiff replied in the affirmative. Lange then advised her that he was in possession of all the policies listed in the letter; that he would file appropriate claims for the proceeds; and upon receipt of the proceeds he would notify her and arrange to deliver them. On May 2, 1962, plaintiff at the direction of Lange, went to his home. There he gave her a check for the proceeds of the insurance of policy No. 1 and on May 19, 1962, he gave her the proceeds of policy No. 3. At that time Lange advised her that he had not received any word regarding plaintiff's claim on policy No. 2, but that a $30,000 check had been received on policy No. 4. However, he could not give it to plaintiff until he received Kaufman's authorization. Plaintiff called Lange in September 1962, and Lange advised her that nothing had come in on policy No. 2, and that as to policy No. 4, he still did not have authority to release the proceeds to her.

In October 1962, plaintiff had another conversation with Lange. He advised her that policy No. 2 was not being paid by the insurance company because Szantay was piloting the plane when it crashed. Plaintiff inquired about the status of the proceeds under policy No. 4, and was told that Kaufman had not yet authorized its payout to her.

Plaintiff testified further that in these conversations regarding the proceeds of policy No. 4, Lange told her that when "Kaufman authorized payment he would give me my money." In June of 1962, plaintiff retained legal counsel, Mr. Bjorvik, to pursue her claim against defendant for the proceeds of policy No. 4.

329

As far as plaintiff knew, her husband did not have an employment contract with defendant.

JOHN D. HAYES, testified on behalf of plaintiff.

He is an attorney-at-law and represented plaintiff in her suit for damages for the wrongful death of her husband in the air crash. On or about July 9, 1962, he was with plaintiff's attorney Bjorvik when they visited Kaufman. The witness was present to discuss the wrongful death action against defendant. At that discussion, Bjorvik asked Kaufman: "What about the $30,000.00 life insurance policy?" (Policy No. 4.) Kaufman replied that they had received the proceeds and that plaintiff was entitled to the $30,000, but that its payment would not be authorized until the wrongful death action was disposed of. Bjorvik responded that they were independent claims, and the $30,000 should be paid to plaintiff. Kaufman then reiterated that there was no question that plaintiff was entitled to the money. But the affairs of defendant and of Szantay's estate were such that they could not pay the $30,000 until the wrongful death action was disposed of.

ROGER BJORVIK, testified on behalf of plaintiff.

He is an attorney-at-law and his firm represents plaintiff. On June 7, 1962, he had a conversation with Robert Wehrheim, then president of defendant, who advised him that the proceeds from policy No. 4 were intended to be paid plaintiff, even though defendant was the beneficiary, but because of tax ramifications there was a question on whether the proceeds were to be paid in a lump sum or installments. The witness testified he also had a conversation with Lange the same day and Lange said the proceeds were payable to plaintiff, even though defendant was beneficiary.

On July 9, 1962, the witness, in the company of John Hayes, visited Kaufman at his office. Kaufman in response to the witnesses' question regarding the proceeds

of policy No. 4 said that defendant had received the proceeds and plaintiff was entitled to them, but no funds would be released until the wrongful death action had been disposed of.

During a telephone conversation with Wehrheim, he was told that the employees could name any beneficiary to policies 1, 2 and 3, but as to policy No. 4, it had to be defendant.

BERNARD E. LINDQUIST, testified on behalf of defendant.

He is an insurance broker and was a friend of Szantay. The witness wrote all of defendant's and Szantay's insurance, and was aware that Szantay was sole shareholder of defendant. Policy No. 4 was identified by the witness as one he wrote, and after Clemens' death he forwarded the policy No. 4 to the insurance company. The witness related that he sold Szantay on the idea of purchasing additional insurance on his life as well as defendant's "key employees." This topic came up when he was discussing with Szantay the possibility of securing additional insurance from him personally at a standard rate by insuring additional members of Szantay's company under a "key-man" insurance plan. There were two reasons why he recommended "key-man" insurance, one was that he wanted to sell insurance and the other reason was that Szantay had been a "rated risk." As a result, he and Szantay were always looking for means of increasing Szantay's insurance at standard rates. Szantay was told that the insurance was "key-man" insurance, would be owned by defendant, and it would be the beneficiary. The proceeds would not be taxable. Szantay had indicated that he desired to take out additional life insurance on the lives of his employees and furnished the information to the witness. He testified there are many reasons for the purchase of "key-man" insurance, one is to pay the cost of retraining a new employee, another reason may be a

331

contract with an employee for this insurance, but it is considered mainly for the employee.

The witness stated that the phrase "key-man" life insurance was not used in the policy or on any documents relating to policy No. 4. "Key-man" insurance does not relate to a type of insurance, but to the use of the proceeds once received, and there were no restrictions on defendant's use of the proceeds.

WALTER MEYER, testified on behalf of defendant.

He is a certified public accountant with the firm of Arthur Anderson Co., and he related that he was the manager in charge of defendant's audits. When defendant received the proceeds from policy No. 4, they were recorded in defendant's books as "insurance proceeds payable," which is a liability account. The proceeds from Szantay's policy were reflected as a debit on the cash account and placed into an account titled "surplus." Two months later an audit revised the entry of an account payable, and the proceeds of policy No. 4 were credited to surplus. There was nothing in the company records to indicate that proceeds of policy No. 4 were payable to anyone other than the company. That is why this witness questioned and revised the books to reflect the proceeds in surplus.

M. G. KAUFMAN, testified on behalf of defendant.

He is an attorney-at-law and was a lifelong friend and legal advisor of the deceased Szantay. The witness related he was familiar with the defendant and its officers and employees for many years. At the time of Szantay's death, the witness was attorney and director for defendant, and attorney for the executor of Szantay's estate. There were never any written contracts between defendant and any of its employees. Life insurance policies on lives of employees were never discussed at board meetings. The witness told Lange not to pay the proceeds of policy No. 4 to plaintiff, because it was the conclu-

sion of the witness and the executor, the Northern Trust Company, that the proceeds belonged to defendant. The witness related he had discussed the policies of insurance defendant had on its employees and officers with Szantay and also the disposition of the proceeds in the event of collection.

On July 10, 1962, the witness related that John Hayes and Roger Bjorvik came to his office and he advised them that while the proceeds of policy No. 4 belonged to defendant, in order to settle the dispute regarding the wrongful death action and plaintiff's claim to the proceeds, the witness would recommend to the executor that plaintiff be paid the sum of $70,000. He denied telling Bjorvik or Hayes that plaintiff was entitled to the proceeds of policy No. 4, and further denied he told them the proceeds would be paid plaintiff after the wrongful death action was disposed of.

Lange and Wehrheim were not called upon to testify. On April 12, 1962, Lange wrote a letter, plaintiff's Exhibit No. 2, to Lindquist's company wherein Lange referred to policy No. 4 as "Clemens' Policy" and stated "Mr. Kaufman will file Clemens' claim direct with the insurance company."

OPINION

Plaintiff's claim to the proceeds of policy No. 4 is predicated upon an express oral trust of which she is the beneficiary. Defendant contends that relief should be denied because: (1) Szantay lacked authority to bind the corporate defendant in the creation of a trust of the proceeds of the insurance policy; (2) plaintiff was permitted to testify to a conversation with Szantay in contravention of Ill Rev Stats, c 51, § 2 (1967), commonly known as the dead man's statute; (3) proceeds of an insurance policy may not be the subject-matter of a trust prior to the death of the insured; (4) the trust was not established by clear, convincing, unequivocal and competent evidence.

333

██ Defendant argues that Szantay as president, sole shareholder and a director of defendant lacked the requisite authority to create the express oral trust of the proceeds of the insurance policy. Ordinarily, the president of a corporation has no authority, in absence of action by the board of directors, to enter into, on behalf of the corporation, unusual or extraordinary commitments, contracts or obligations that are not in the regular course of business.

In Korman v. Wanen Catalpa Apartments, Inc., 20 Ill App2d 598, 156 NE2d 621 (1959), the president of the corporation owned 244 of the 250 shares of corporate stock, the other 6 shares were owned by his wife and daughter. The president contracted to sell the sole corporate asset. The contract was negotiated by the president alone, the officers and directors were not consulted. In holding the corporation bound, the court said that if the president of the corporation carries on negotiations with apparent authority to bind the corporation, and the corporation does not object to the president's action in that regard, then the corporation is bound by the authority exercised by its president.

In Mid-Continent Const. Co. v. Goldberg, 40 Ill App2d 251, 188 NE2d 511 (1963) the court said at page 261:

> "The Korman decision is consistent with writing in this area. In Professor Fuller's article, The Incorporated Individual: A study of the One-Man Company, 51 Harv L Rev 1373, 1388, he states:
>
> > "It has been urged that a shareholder-manager may not contract in the corporate name in the absence of authority from the board of directors. But if the one-man company is viewed realistically, it affords no proper place for the application of general agency principles to the activities of the shareholder-manager. Where a sole shareholder purports to act in behalf of the company,

334

there is no other person concerned; he acts in his own interest and for himself alone. The justification existing in the ordinary corporate situation for treating the corporation as a separate person, i. e., a principal, is entirely lacking."

At page 260 the court quoted with approval from 19 CJS, Corporations, § 1004:

"[T]he trend of authority is to uphold as binding on the corporation acts or contracts on its behalf by a person or persons owning all or practically all of the stock, even though there is a lack of, or defect in, some corporate step or action. . . . [T]he fact that certain officers own all or practically all of the stock may have an important bearing in determining the validity and binding effect of their acts. Thus, where certain officers are the sole corporate owners of the corporation, they are not limited in the control of the corporate affairs by a board of directors which must necessarily consist of dummies, and the corporation is bound by the acts of officers who are in reality its owners and are permitted by the director to manage the business; . . . ."

Defendant cites Smith v. Shoreline Printers & Publishers, Inc., 6 Ill App2d 290, 127 NE2d 677 (1955) ; Sacks v. Helene Curtis Industries, Inc., 340 Ill App 76, 91 NE2d 127 (1950) ; and Warszawa v. White Eagle Brewing Co., 299 Ill App 509, 20 NE2d 343 (1939) in support of its contentions regarding Szantay's lack of authority. In Smith, supra, the president owned only 2 shares of 2,551 shares of stock issued and outstanding. The court noted that the president's wife owned the controlling interest of 1,336 shares, a son owned 646 shares and a daughter owned 567 shares, and there was no evidence that the

president's wife was not in control of her separate property rights or that she was regarded as his nominee. Sacks, supra, cited Warszawa, supra, and in these two cases, there was no evidence to support the authority of its president to enter into extraordinary contracts or commitments, nor that the respective presidents were the sole owners and shareholders.

The Master specifically found that Szantay as president and sole shareholder had authority to bind defendant. This was approved by the trial court over defendant's exceptions. We concur that Szantay had the requisite authority.

Defendant contends that the testimony of Mrs. Clemens, which was admitted over its objection, concerning her conversation with Mr. Szantay on the air trip to Iowa, was inadmissible because of Ill Rev Stats, c 51, § 2 (1967) which provides:

> "No party to any civil action, suit or proceeding . . . shall be allowed to testify therein of his own motion, or in his own behalf . . . when any adverse party sues or defends as the . . . trustee of any . . . heir, legatee or devisee. . . ."

We fail to see how the defendant is a protected party within the terms of the statute. Defendant's answer denied that it was a trustee as alleged in the complaint, yet defendant seeks the protection granted to a trustee of an heir, legatee or devisee under the statute to render the testimony of Mrs. Clemens incompetent. A reading of the complaint reveals that it could reasonably be said that defendant was sued as a trustee of the heirs of James Clemens. This does not, however, change the capacity in which the defendant defended the suit. Defendant defended from the position that it was the absolute owner of the proceeds of the insurance policy,

not as the trustee of an heir, legatee or devisee. The statute provides that "when a party sues or defends" in one of the enumerated protected capacities, he may assert the protection of the statute. In the case at bar, the defendant neither sued nor defended as an adverse party in one of the protected capacities under the statute. Therefore, the defendant is not entitled to the protection of the statute.

▮ Defendant concedes that a life insurance policy may be the subject-matter of a trust, but argues that the proceeds of an insurance policy cannot be the subject-matter of a trust.

▮ In the case of Otis v. Beckwith, 49 Ill 121 (1868), our Supreme Court enforced a trust upon the proceeds of an insurance policy. In Otis the administrator of the Estate of Edward Sacket refused to deliver a policy of insurance which was in the possession of the decedent at the date of his death. The insurance policy was assigned in writing to the named trustee; the insurance company had noted the assignment on its books and the trustee had accepted the trust by written instrument. We are mindful that the facts in Otis are different from those here, but the legal issue and its resolution are applicable to the litigation before us. Otis is discussed extensively in Gurnett v. Mutual Life Ins. Co., 356 Ill 612, 191 NE2d 250 (1934); see also 102 ALR 588.

▮ Defendant asserted in its brief that even assuming that a trust of insurance proceeds can arise, the ultimate issue in the case at bar is whether a trust did, in fact, arise. Defendant correctly contends that the evidence required to establish a trust must be clear, convincing and unequivocal both as to its existence and to its terms and conditions. Trubey v. Pease, 240 Ill 513, 88 NE 1005 (1909); Williams v. Anderson, 288 Ill App 149, 5 NE 2d 593 (1936); Otis, supra.

337

We must, therefore, consider defendant's contention that plaintiff failed to prove her case by clear, convincing and unequivocal evidence. Plaintiff testified that Mr. Szantay told her that although the corporation was named as beneficiary, the proceeds of the insurance policy, in the event of her husband's death, would be paid to her and to her alone. Whether her testimony is credible or whether it is impeached are generally matters for the trier of fact, and its findings will not be disturbed unless they are against the manifest weight of evidence. In re Estate of Foster, 104 Ill App2d 447, 244 NE2d 620 (1969). After the death of plaintiff's husband, the corporation treated the proceeds of the insurance policy as a liability of the corporation. The course of conduct and the conversations (as testified to by plaintiff and her witnesses) between plaintiff and the Secretary-Treasurer and the attorney of defendant (both of whom were directors and thus constituted a ⅔ majority of the board) all indicate that defendant considered the proceeds of the policies as plaintiff's property. Two attorneys, one an attorney for plaintiff in another matter and one a member of the law firm representing plaintiff in the present litigation, testified to conversations with different officers of defendant in which the officers reaffirmed plaintiff's right to the proceeds. It must also be noted that defendant neither called certain officers of the corporation to rebut plaintiff's evidence nor explain why they were not called. The Master heard the evidence and observed the demeanor of the witnesses and made his recommendations to the Chancellor, who heard exceptions to the Master's Report and then approved the Master's Report as modified in ways not here pertinent. The findings of the Master when approved by the Chancellor will not be disturbed on review in the Appellate Court unless they are manifestly against the weight of evidence.

Ideal Trading Corp. v. 237 E. Ontario Corp., 82 Ill App2d 160, 227 NE2d 150 (1967). We find that the decree is supported by evidence and see no basis to find it was against the manifest weight of evidence.

Plaintiff cross-appealed and complained that the trial court erred in sustaining defendant's oral objection to the imposition of interest on plaintiff's recovery of $29,330.70, which objection was made for the first time when the decree was presented for entry.

Plaintiff further contends that defendant's failure to specifically object to the allowance of interest before the Master and to include the objection in its exceptions to the Master's Report constituted a waiver of the objection to the allowance of interest. Plaintiff argues that notwithstanding the waiver of the objection, the allowance of interest by the Master was proper, whether it be based on equitable consideration or Ill Rev Stats, c 74, § 2 (1967) which provides for interest: ". . . on money withheld by an unreasonable and vexatious delay of payment."

Defendant responds and argues that plaintiff's claim to interest is predicated upon paragraph 10 of the Master's Report wherein the Master "recommends" that a decree be entered in favor of plaintiff against defendant and the sum recovered be paid to plaintiff with 5% interest per annum, and there is no finding of fact or conclusion of law regarding the imposition of interest. Defendant further contends that it objected to the Master's findings that plaintiff is the owner of the proceeds. Therefore, if plaintiff is not entitled to a judgment, plaintiff is not entitled to interest and that for plaintiff to insist that although defendant objected to the entry of a judgment in favor of plaintiff, this does not constitute an objection to the awarding of interest, is too semantic and technical.

339

The issue thus is, whether the defendant's objections to the Master's finding that plaintiff is the owner of the proceeds and further objections to the entry of a judgment for the principal in favor of plaintiff, embrace within themselves, without specificity, an objection to the imposition of interest. The Master did not make a finding of fact or conclusion of law that interest was to be assessed upon the principal amount, but merely recited it in his recommendation regarding the framing of the decree.

In Cooper v. Brogni, 50 Ill App2d 70, 199 NE2d 619 (1964), the court said at page 77:

> "Interest is allowed in chancery where warranted by equitable consideration. It has been held that in order to have an unreasonable and vexatious delay which would authorize a court of chancery to award interest, there must be something more than mere delay of payment, and the appearance and defense of a suit is not considered such delay. There must be continuance on the part of the litigant causing the delay which comes very close to actual fraud."

We hold that under the record in this case, defendant's objections were sufficient to obviate any waiver and the trial court properly entertained defendant's objection to the assessment of interest and did not abuse its discretion in the disallowance of interest.

For the foregoing reasons we therefore affirm the judgment of the trial court.

Judgment affirmed.

ENGLISH and McNAMARA, JJ., concur.