Pamela M. Ziarko *et al.*, Plaintiffs-Appellees, *v.* John Ziarko, Defendant-Appellant.

(No. 59736;

First District (2nd Division)—September 3, 1974.

Allan G. Levine and Anthony Spina, both of Chicago, for appellant.

Richard D. Price and Frederick J. Bertram, both of Chicago, for appellees.

Mr. JUSTICE DOWNING delivered the opinion of the court:

This is an appeal from an order establishing a constructive trust in certain life insurance benefits and pension funds. Plaintiffs are heirs at law of the deceased, Stanley Ziarko, who claimed in the court below that they were entitled to the proceeds of the insurance and pension funds, which had allegedly been wrongfully converted by their uncle, the brother of the deceased, John Ziarko, one of the defendants below.[1] John Ziarko had been designated beneficiary of the insurance policies and pension funds in question. The trial court, sitting without a jury, entered judgment for plaintiffs, and this appeal follows.

The amended complaint to declare a trust and for an accounting alleged, in pertinent part, that plaintiffs were the children and heirs at law of the deceased, who died intestate on January 31, 1971; that plaintiffs had lived with and had been supported by the deceased, who had been employed as a bus driver for approximately 25 years by the Chicago Transit Authority (hereinafter CTA); that, upon the the death of their father, certain benefits under a retirement plan of the CTA, accrued salary, and certain life insurance benefits were to accrue to the family of the deceased; that, in 1963, the deceased and plaintiffs' mother, Dolores Ziarko Valenta, had been divorced; and that the decree of divorce provided, among other things, that: 1) plaintiffs' mother was to maintain custody of plaintiffs, who were minor children at the time; 2) Stanley Ziarko was to provide school tuition, books, and uniforms for plaintiffs, pay all of their medical and dental expenses, and continue in full force and effect certain life insurance policies written on each of the lives of the plaintiffs[2]; and 3) Stanley Ziarko was to maintain in full force and effect life insurance in the amount of $1,600 written on his own life, under which insurance plaintiffs were to be named primary beneficiaries.

The amended complaint further alleged that John Ziarko (hereinafter defendant) was a successful businessman, that Stanley Ziarko was unacquainted with business matters, and, in such matters, placed implicit confidence and trust in the defendant; that, based upon such trust and confidence, Stanley placed the defendant's name, as beneficiary, upon all insurance policies covering his life and those of the plaintiffs, as well as upon documents securing Stanley's pension and retirement funds;

---

[1] Plaintiffs joined as defendants below the Chicago Transit Authority and Lillian Ziarko, the wife of John Ziarko, the appellant herein. As part of its decree, the trial court dismissed the CTA and found the issues in favor of Lillian Ziarko and against the plaintiffs. Consequently, the CTA and Lillian Ziarko are not parties to this appeal.

[2] These policies are not among those contested in this litigation and are not those upon which defendant collected proceeds.

that Stanley designated the defendant as beneficiary based upon his confidence that defendant, upon Stanley's death, would hold said funds and proceeds in trust for the use and benefit of plaintiffs and would distribute same to plaintiffs; that their father informed plaintiffs, before his death, that when he died, defendant would collect for them all monies due upon such insurance, pension funds, and the retirement plan and that defendant had promised them further that he would turn over said proceeds to plaintiffs; and that their father informed them that, because plaintiffs were minors, an adult had to be named as beneficiary of said proceeds, but that defendant could be trusted to turn over all of the money to them.

Continuing, plaintiffs further alleged that, subsequent to their father's death, defendant and his wife, Lillian, procured the above-described insurance policies and proceeded to collect certain life insurance benefits and the pension and retirement funds, all of which totalled $14,467.-95; that, thereafter, they were informed by defendant that plaintiffs had no interest in any of the proceeds, that defendant was the only person entitled to the proceeds, as the named beneficiary, and that plaintiffs would receive none of the proceeds; and that defendant and Lillian Ziarko had knowingly and wilfully violated the trust and confidence placed in them by their father, Stanley Ziarko.

As part of their prayer for relief in the court below, plaintiffs requested that the court order an accounting to the plaintiffs by the defendant and Lillian Ziarko for all of the proceeds described and that the court decree the existence of a trust for the use and benefit of plaintiffs in said proceeds.

The answer filed in response to plaintiffs' amended complaint may be characterized, for our purposes here, as a general denial of the material allegations contained therein.[3]

The testimony and evidence presented below established, in pertinent part, that plaintiffs are the children of Stanley Ziarko, who died intestate on January 31, 1971, at the age of 50. On December 20, 1963, Stanley was divorced from Dolores Ziarko Valenta, plaintiffs' mother, and Dolores was awarded sole custody of plaintiffs, who were minor children at the

---

[3] It is to be noted that in the original answer filed in the court below (verified by John and Lillian), defendant, who was joined at that point as party defendant with Lillian Ziarko and the CTA, admitted that Stanley Ziarko had trust and confidence in defendant, because defendant had taken Stanley into his home when all others had abandoned him, and further stated that defendant had been designated beneficiary on the life insurance policies as repayment for the many kindnesses defendant had extended to Stanley. Defendant further denied that any trust had been imposed upon him by Stanley Ziarko and that any promise had been made by defendant to turn over the proceeds of the policies to plaintiffs.

time. Sometime in 1962, Stanley, alone, moved into a basement apartment in a building owned by his brother, the defendant, where he lived rent-free for a period of from 3 to 4 years; during that period, defendant provided Stanley with food and did not charge him for the use of utilities in the apartment.

As to the CTA retirement plan, the record indicates that on April 20, 1950, Stanley designated his mother as the primary beneficiary and his father as the secondary beneficiary and that that designation was changed by Stanley on December 2, 1964, whereupon the defendant was named primary beneficiary and the three children (Pamela, Nancy and Joseph) secondary beneficiaries, *share and share alike*. On the date of the change, the ages of the children of Stanley were: Pamela 12, Nancy 9 and Joseph 8.

Regarding the CTA employees group policy with Travelers Insurance Company and the policy upon the life of Stanley with Prudential Insurance Company of America, the record does not clearly indicate the date of the beneficiary change. However, the record is abundantly clear that the matter was tried on the theory that a beneficiary change had been made, designated the defendant as the primary beneficiary, and that the defendant collected and retained the proceeds upon the death of Stanley.

In 1967, Stanley took a different apartment in defendant's building and began paying defendant a monthly rental of $70. The same year, Stanley's oldest daughter, Pamela, a plaintiff herein, came to live with her father; at the time she was 15 or 16 years of age. Stanley's youngest child, Joseph, a plaintiff herein (then age 13), began living with his father sometime during 1969, and, approximately 2 or 3 months prior to her father's death, Stanley's other daughter, Nancy (then a minor), also a plaintiff herein, took up residence with her father.

Pamela testified, in part, that her father had been capable of handling his own business affairs and that defendant had controlled none of her father's funds. She stated that her father handled his own checking account, maintained a bank account for several years prior to his death, and owned bonds, some of them in his own name, others in his and Pamela's names. Pamela shared some of the household expenses while living with her father, and she testified that, prior to his death, her father paid all debts for which he was responsible to defendant.

Over objection, Pamela further testified regarding a conversation which allegedly took place on or about December 22, 1970; present during the conversation were her father, herself, Nancy Ziarko, and Joseph Ziarko. Pamela testified that, at that time, her father had told the children that "if anything should ever happen to him [Stanley] that he's

[defendant] got plenty of money and my uncle John [defendant] should take care of us and we wouldn't have to worry about it." Continuing, she testified further that her father said on the occasion in question that "Your uncle will take care of you, I put the policy in his name because you aren't old enough to be on them."

Nancy Ziarko also testified with respect to the December, 1970, conversation, and stated that her father had said that "he [Stanley] had insurance policies and pension and everything from C.T.A. signed over to my Uncle John [defendant] because Pam wasn't twenty-one, and he felt that she couldn't take care of herself and two kids younger than her and tuitions. He said that my uncle would take care of us and make sure our tuition was paid and everything else."

Joseph Ziarko also testified regarding the December, 1970 conversation, and he stated that his father had said that the insurance would "cover us and we get the money for the insurance if he died  *  *  *."

Pamela characterized her relationship with defendant as a "short hello," and she stated that plaintiffs and defendant only visited on certain holidays and only when their father was present. She stated that she never conversed with defendant prior to her father's death concerning the fact that defendant was the beneficiary of her father's insurance, and, further, that she and her father had physical possession of the insurance policies until after her father's death.

Pamela further testified that she had a conversation with Lillian Ziarko, in the presence of her sister, Nancy, just after her father's death, in which Lillian allegedly assured her that defendant would give her the insurance proceeds. Nancy Ziarko also testified to the same conversation, stating that Lillian had said that defendant would "make sure he takes care of you children" with the proceeds of the insurance. Lillian Ziarko, when called to testify, denied the substance of this conversation as characterized by Pamela and Nancy, stating that she, Pamela, and Nancy had spoken of other matters related to Stanley Ziarko's death.

Defendant, testifying on his own behalf, denied that he had any knowledge of the insurance policies and retirement benefits in question prior to Stanley Ziarko's death. He stated that the first time he learned about the circumstances was at the funeral chapel after Stanley had died. Lillian Ziarko, in her testimony, stated that defendant first learned of the insurance on the first night of Stanley's wake.

Anna Golding, a CTA employee, identified the defendant and his wife as the persons who had appeared at the CTA offices on March 8, 1971, to collect an insurance check from the CTA, and testified that she had presented the defendant with a check for $6,000 on that date. She stated that, at the time of the transaction, defendant, to the best of her

recollection, had said that the "money will be left in trust for the children." Defendant denied, in his testimony, the substance of the March 8, 1971, conversation as characterized by Anna Golding and further denied that his wife had accompanied him to the CTA offices on that date. Lillian Ziarko testified that she was home the entire day on March 8, 1971.

There was also testimony in the court below by various witnesses that Stanley Ziarko had borrowed money from defendant over a period of many years. Lillian Ziarko, testifying from records she had kept, stated that the total of the loans made by defendant to Stanley was approximately $1,800. Defendant testified that none of the money had been repaid.

The trial court, after having rendered its findings, entered judgment for plaintiffs, and against defendant, for the sum of $14,467.95, plus costs; ordered that defendant render an accounting to plaintiffs for the use of said sum and for any interest received thereon by defendant; dismissed as a defendant the CTA, without prejudice to the rights of either plaintiffs or the CTA; and found the issues with respect to Lillian Ziarko in her favor and against plaintiffs.

The issues presented on appeal are:

1) whether the trial court erred in admitting plaintiffs' testimony concerning alleged conversations between plaintiffs and their father before his death;

2) whether plaintiffs failed to establish the presence of the elements necessary to support a constructive trust; and

3) whether, assuming that all evidence offered by plaintiffs was properly received, the decree entered below was contrary to the manifest weight of the evidence.

## I.

Defendant urges that plaintiffs' testimony in the court below regarding the conversations with their father, Stanley, prior to his death, should have been excluded (a) as hearsay evidence or (b) as violative of the "Dead Man's Act" (Ill. Rev. Stat. 1971, ch. 51, par. 2); defendant further argues (c) that if the testimony was admissible, it should have been afforded no weight. Defendant asserts that these errors were critical, as plaintiffs' entire case in support of the existence of a confidential relationship between Stanley and John was based upon the testimony.

## A.

The "Dead Man's Act," section 2 of the Evidence Act (Ill. Rev. Stat. 1971, ch. 51, par. 2) reads, in pertinent part:

"No party to any civil action, suit or proceeding, or person directly interested in the event thereof, shall be allowed to testify therein of his own motion, or in his own behalf, by virtue of the foregoing section, when any adverse party sues or defends as the * * * executor, administrator, heirs, legatee or devisee of any deceased person, * * *."[4]

Defendant argues that he, as a designated "beneficiary," occupies a position not unlike that of a "legatee" within the meaning of the statute quoted. He argues that the beneficiary of insurance and pension death benefit proceeds, the payment of which is conditioned upon death, should occupy no different a position than one named in a deceased person's will. We disagree, and we hold that the court below committed no error in receiving plaintiffs' testimony, as defendant did not defend as the executor, administrator, heir, legatee or devisee of any deceased person. He defended only as the beneficiary of certain insurance policies and pension and retirement funds. *Anderson v. Lybeck* (1958), 15 Ill. 2d 227, 233, 154 N.E.2d 259; *Clemens v. Sandee Manufacturing Co.* (1st Dist. 1969), 114 Ill.App.2d 322, 336-337, 252 N.E.2d 897.

## B.

Defendant next urges that the trial court erred in allowing plaintiffs' testimony concerning conversations they had had with their father on December 22, 1970, outside the presence of defendant; it is defendant's contention that this testimony was hearsay evidence and, as such, should have been excluded. Conversations such as those which are claimed to have been erroneously admitted in this case have been considered competent in a long line of Illinois cases involving constructive trust situations. *Kauzlarich v. Landrum* (3rd Dist. 1971), 2 Ill.App.3d 591, 274 N.E.2d 915; *Kester v. Crilly* (1950), 405 Ill. 425, 91 N.E.2d 419; and *Sharp v. Bradshaw* (1937), 367 Ill. 526, 12 N.E.2d 1, among them.

■■ While under other circumstances such testimony might be inadmissible as hearsay evidence, owing to the peculiar nature of cases involving the imposition of constructive trusts, our courts have seen fit to admit the testimony and allow the court before whom it is presented to consider the credibility of the witness testifying to the conversation and to weigh the value of its contents. We hold that the trial court committed no error in admitting the plaintiffs' testimony. The testimony's weight, and the credibility of the plaintiffs in so testifying, were clearly matters for the trial court.

---

[4] It is to be noted that the "Dead Man's Act" was completely rewritten, effective October 1, 1973, with respect to all proceedings filed on and after that date (Ill. Rev. Stat. 1973, ch. 51, par. 2(4)(d)).

## C.

Defendant also suggests that even if legally admissible, plaintiffs' testimony should have been given no weight. As we have stated, we find the testimony legally admissible, and the question as to the weight it should have been given is fully discussed in the remaining sections of this opinion.

## II.

■■ Defendant contends that plaintiffs failed to establish the presence of the elements necessary to support a constructive trust. Our courts have often addressed themselves to questions concerning the nature and definition of a constructive trust. This court, in *Kauzlarich v. Landrum, supra,* stated at page 595:

> "Constructive trusts are divided into two general classes, one being where actual fraud is present and the other where the existence of the confidential relation and subsequent abuse thereof is present. The mere existence of a confidential relationship prohibits the dominant party from seeking any selfish benefit during the course of the relationship and affords a basis for fastening a constructive trust upon property so acquired. Where a confidential relation exists it is presumed that the transaction resulted from influence and superiority and the burden rests upon the grantee or devisee to show that it was fair, equitable and just. *Kester v. Crilly,* 405 Ill. 425; *Wagner v. Clauson,* 399 Ill. 403; *Schueler v. Blomstrand,* 394 Ill. 600. See also *Scott on Trusts,* Third Edition, 1967, Volume I, Section 55.1, Pages 419 *et seq.*"

Professor Bogert, in his treatise on the law of trusts and trustees, states:

> "In declaring a relation technically 'confidential,' the courts lay stress on various factors. There is always, of course, the actual placing of trust and confidence on at least one occasion, and often such reliance has been exhibited through a series of months or years. In some cases this imposition of confidence seems to be the sole foundation for the finding of a confidential relation. But generally there is great disparity of position, in addition to the actual intrustment and this disparity is treated as highly important or as absolutely essential." The Law of Trusts and Trustees § 482, at 136-138 (2d ed. 1960).

In Kapraun v. Kapraun (1957), 12 Ill.2d 348, 146 N.E.2d 7, our supreme court, at pages 352-353 of its opinion, stated:

> "It is well settled that where a fiduciary relationship does not exist as a matter of law, but the parties seek to establish a con-

structive trust by parol evidence, the burden of proof is on the plaintiffs in the first instance to prove the existence of the fiduciary relationship by proof so clear, convincing, strong, unequivocal and unmistakable as to lead to but one conclusion. (*Kolze v. Fordtran*, 412 Ill. 461; *Compton v. Compton*, 414 Ill. 149; *Maley v. Burns*, 6 Ill.2d 11.) A fiduciary or confidential relationship, as used in a case of this nature, is a very broad one and the factors to be taken into consideration are difficult to define precisely. The relationship may exist as a matter of law or it may be moral, social, domestic or purely personal. We have said that some of the factors to be taken into consideration are degree of kinship, disparity in age, health and mental condition, the relative education and business experience of the parties, and the like. *Kester v. Crilly*, 405 Ill. 425; *Stephenson v. Kulichek*, 410 Ill. 139."

It is also clear that a close familial relationship, such as that of brother and sister, does not, of itself, establish a fiduciary or confidential relationship. *Bilyeu v. Plant* (5th Dist. 1966), 75 Ill.App.2d 109, 120, 220 N.E.2d 513.

Set against this backdrop of principles, we find, based upon a thorough review of the record, that plaintiffs established in the court below the elements necessary to support the imposition of a constructive trust upon the insurance proceeds, pension benefits, and retirement funds of their father, which were converted by defendant to his own use.

The trial court was in a position to observe the demeanor of the various witnesses and to determine the weight to be accorded their testimony, as well as their credibility. Credibility of witnesses, particularly in circumstances wherein the existence of a confidential relationship is sought to be shown, looms large among the factors which may lead a court to find whether such a relationship did, in fact, exist.

It is apparent from the record presented that at several junctures the testimony of defendant and his wife, Lillian, was directly at odds with that of the plaintiffs herein; at times, in fact, defendant's statements could have been construed by the trial court as simply incredible.[5] Both plaintiffs and Lillian testified regarding the meeting they had just after Stanley Ziarko died, and the versions of what was said and what took place were wholly in conflict; thus, the respective witnesses' credibility became acutely important to the trial judge.

Further, there were testimonial conflicts as to the time at which defen-

---

[5] This can be illustrated, for example, by defendant's testimony regarding when he first learned he had been designated as a beneficiary; when he had acquired the Prudential insurance policy; and whether he had had conversations at the office of the CTA with Anna Golding.

dant learned that he had been named beneficiary of the insurance and the pension and retirement funds: Lillian testified that his knowledge came on the first night of Stanley's wake; defendant claimed that he learned of the matter at Stanley's funeral, though he did not divulge the source of the information; Josephine Brash testified that when she mentioned to defendant that she had heard he had been named beneficiary, defendant indicated that he already knew of the fact. Anna Golding, a disinterested witness, testified as to what defendant stated to her on March 8, 1971, concerning the plaintiffs' welfare; defendant not only denied that he had a conversation with Anna Golding, but also denied that he had been accompanied by his wife on the day in question, although Anna Golding identified her in court as having been at the CTA offices on that day.

From the evidence presented, we have no doubt that the trial court found that Stanley Ziarko had placed trust and confidence in his brother, the defendant, on several occasions, specifically at those times at which Stanley arranged to change the beneficiary designations to name his brother as beneficiary on the various insurance policies and retirement and pension fund documents. It is evident from the record that these changes were undertaken to insure that plaintiffs, then of tender age, were to be taken care of, to be provided for, with the proceeds which were to flow from the several sources upon the death of their father. It is also apparent that Stanley, based upon the trust and confidence which he reposed in his brother, evidenced by the close contact between the two, made the changes in light of the seemingly trustworthy, stated intention of the defendant that he would provide for the children upon his brother's death.

■■ In fact, the record is clear that Stanley had not forgotten his minor children. This is evident from his action on December 2, 1964, when he changed the beneficiary under the CTA retirement plan and named John as the primary beneficiary and his three minor children as the secondary beneficiaries.

We find the confidential relationship established below to have been moral and personal in character. In arriving at that characterization, we have considered all of the testimony, especially that with respect to the relative disparity of business acumen between the two men, as well as testimony relating to their social and familial relationship.

The findings rendered by the trial court are unequivocal, reflecting the court's feeling that the evidence presented by plaintiffs was clear, strong, and convincing; it was evidence which could lead to but one conclusion. Moreover, in reviewing a case of this nature tried without a jury, this court is not in a position to disturb the findings of the trial court unless

such findings are manifestly erroneous (*Bilyeu v. Plant, supra*, at page 119). We certainly cannot say, judging from the record before us, that the trial court's findings reflect any manifest error.

### III.

Finally, defendant argues that the decree entered by the trial court was contrary to the manifest weight of the evidence presented. For the reasons previously set forth in section II, we reject this argument as well, following the rule that we will not disturb findings of a trial court unless they are manifestly erroneous. *Bilyeu v. Plant, supra.*

■■ For these reasons, then, we affirm the decree entered by the circuit court of Cook County.

Judgment affirmed.

STAMOS and LEIGHTON, JJ., concur.